**PRINTING PLATE SUPPLY COMPANY**
**and Robert R. Myers, Jr., Plaintiffs,**

v.

**The CRESCENT ENGRAVING COMPA-**
**NY, Kalamat Company, and Ben R.**
**Preston, Defendants.**

**No. 4103.**

United States District Court
W. D. Michigan, S. D.

Sept. 30, 1965.

Dick, Zarley, McKee & Thomte, Des Moines, Iowa, D. H. Zarley, Des Moines, Iowa, of counsel, Price & Heneveld, Grand Rapids, Mich., Lloyd A. Heneveld, Grand Rapids, Mich., of counsel, for plaintiffs.

Woodhams, Blanchard & Flynn, Kalamazoo, Mich., Robert E. Woodhams, Kalamazoo, Mich., of counsel, Stratton, Wise, Early, Starbuck & Lennon, Kalamazoo, Mich., Benjamin W. Wise, Kalamazoo, Mich., of counsel, for defendants.

FOX, District Judge.

This is an action seeking an injunction against alleged infringements of the patents in suit, an accounting of profits, treble damages, costs, and attorney fees.

Plaintiff Robert R. Myers, Jr., is the inventor of record of United States Patents No. 2,507,347; 2,800,856; 2,814,990; and 3,062,139 (hereafter referred to as the "347", "856," "990," and the "139" patents, respectively).

"Myers Enterprises, Inc." is the present name of the original plaintiff, Printing Plate Supply Co., and for purposes of this opinion, the two names are interchangeable. However, for purposes of clarity, this court will refer to the corporate plaintiff at all times as "Printing Plate."

Individual plaintiff Myers is the inventor of all patents in suit, and the owner of the 856, 990 and 139 patents. Plaintiff Printing Plate is the owner of the 347 patent and exclusive licensee of the 856, 990 and 139 patents.

The patents in suit are concerned with methods of producing printing plates for use in the printing industry.

This industry had been dominated for decades by the lead-backed electrotype printing plate, which consisted of a thin electrotype shell with a lead backing. The manufacture of this plate involved the pouring of molten lead onto the back of the printing shell, and then allowing the lead to cool and set.

The result was a heavy, cumbersome plate which was then shaved to the desired thickness.

A further process to which such plates were subjected is known in the industry as the "make-ready process." This consisted of correcting areas of the plate which were not of uniform thickness by either placing a layer of suitable material over the desired area of the printing surface and then passing the plate between pressure rolls, or by actually hammering on the back of the plate.

This process could also be utilized to create variations in the elevation of the printing surface, which resulted in differing contrasts in the final print produced by the plate.

The weight of the finished plate gave rise to problems in the industry with the advent of the high speed printing press. Because of the great centrifugal force generated by the use of these heavy plates, and the component materials involved, the presses could not be operated at top speed without causing undue wear and tear on the printing plates. Thus, the industry was actively engaged in a search for a durable lightweight printing plate which could be used on the new printing presses without frequent and unnecessary stoppage.

The most successful solution to the problem prior to that offered by plaintiffs had been the so-called "Time-Life" plate. This is produced by shaving away a portion of the lead on a lead-backed plate and replacing it with a solid layer of aluminum, which is glued to the shaved plate. The result is a lighter, but still relatively heavy printing plate, which re-quires at least six manufacturing techniques not required by plaintiff's process.

Defendant Preston, in cooperation with another, had been working on the "Bista" plate, which was a plate backed entirely with plastic, but this proved unsuccessful.

At this point, it is well to consider the specific patents in suit, in the order in which they were granted.

The 347 patent, as originally applied for, sought patent protection for the application of a lead backing to a curved printing shell by means of a centrifugal casting machine, as well as for a solution to problems of the make-ready process, specifically, the placing of a sheet of paper or like material adjacent to the portion of the printing surface in the desired area(s) during the casting process, so that while the plate is being formed, the paper between the printing shell and the mold produces the desired variations in the surface thereof by reason of the pressure exerted simultaneously by the backing material which is being pressed onto the rear of the shell. A patent was granted only on the "make-ready" aspects of the patent application.

The 856 patent was granted in 1953, and represented an attempt to deal with a problem encountered in the search for a practical, lightweight printing plate.

In bonding together a printing shell, a layer of thermoplastic material and a layer of light weight backing metal with suitable adhesive, it was found that during the laminating process any surplus plastic at a given point had to flow to another location or out the sides of the plate, due to the compression applied during the laminating process.

For example, if compression were great near the center of the plate, the plastic sheet would be thinnest at that point, and the excess would have to move to the outer edges of the plate, causing an inconsistent density and attendant unevenness of the finished plate. To accomplish even this undesirable result, the plastic would have to be heated to a temperature at which it would be fluid enough to move

freely to any point on the plate. Furthermore, plates do not cool evenly and this too could cause an objectionable finished product.

To overcome these difficulties, the plaintiff Myers provided, instead of a solid sheet of plastic, an irregular surface or perforated sheet. The result was, that when a surplus of plastic resulted from the compression, it filled the immediately surrounding irregularities or perforations, without affecting the remainder of the area.

The 990 patent was granted in 1954, and represented a further refinement of the solution presented by the 856 patent to the problem of lateral flow of the plastic material.

The 990 patent involved a process for making a printing plate in which solid plastic is used but a perforated aluminum backing is substituted for the solid aluminum backing. The perforations were filled with the soft plastic during the laminating process, and this provided (with the proper application of adhesive) a more secure bond between the plastic and the aluminum, giving a plate more durability. But more importantly, instead of forcing the plastic to flow laterally, which resulted in voids of entrapped air under the surface of the printing shell, the perforated aluminum allowed the plastic to flow vertically, permitting the air to escape from the voids and the plastic to then fill these voids.

The 139 patent was granted in 1959 and embodies the last refinement in plaintiff's process. Air and soft spots directly behind the printing shell were eliminated by the use of a layer of cheesecloth, which absorbed the trapped air and allowed it to escape from the printing plate. Myers also sought to obtain a patent on the idea of placing plastic on both sides of the perforated metal sheet, but the Patent Office granted a patent only on the cheesecloth concept.

The plaintiff's "Color-line" process is the trade name for the inventions incorporated into the lightweight printing shells covered by patents 856, 990, and 139.

Defendants raise the defenses of invalidity, non-infringement, and patent misuse, and each of these will be considered in separate parts of this opinion.

## I. VALIDITY:

Defendants attack the validity of each of the four patents involved in this action.

■ In general, in any action in which the validity of a patent is attacked, there is a strong presumption of the validity of the patent issued by the United States Patent Office. 35 U.S.C.A. § 282; Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, cert. den. 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369; Colgate-Palmolive Co. v. Carter Products, Inc., 4 Cir., 230 F.2d 855, cert. den. 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59, reh. den. 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120.

■ There is a heavy burden of proof upon the party asserting invalidity. 35 U.S.C.A. § 282; Patterson-Ballagh Corp. v. Moss, 9 Cir., 201 F.2d 403; Ezee Stone Cutter Mfg. Co. v. Southwest Indies Prod., Inc., 8 Cir., 262 F.2d 183; Squeeze-a-Purse Corp. v. Stiller, D.C., 175 F.Supp. 667, aff'd. 280 F.2d 424 (CCA 6), cert. den. 364 U.S. 828, 81 S. Ct. 67, 5 L.Ed.2d 56.

■ The standard of patentability (or validity) has been declared by the Sixth Circuit Court of Appeals to consist of three concepts: utility, novelty, and invention. Monroe Auto Equipment Co. v. Heckathorn Mfg. & Supply Co., 332 F.2d 406, cert. den. 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93; Harvey v. Levine, 322 F.2d 481; Maytag Co. v. Murray Corp. of America, 318 F.2d 79; Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911, cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87; Allied Wheel Products v. Rude, 206 F.2d 752.

The utility of the patents in suit has not been questioned. Novelty and invention are thoroughly discussed in the Mon-

roe Auto Equipment Co. case, supra, from which the following quotes are taken:

"Telescoped, the test is whether the device would have been obvious to one skilled in the art. Maytag Co. v. Murray Corp. of America, supra, 318 F.2d at 81; Firestone v. Aluminum Co. of America, 285 F.2d 928, 930 (C.A.6); Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911, 917 (C.A.6), cert. denied, Firestone v. Aluminum Co. of Amer., 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87.

"From this it may be said that invention is synonymous with unobviousness. Thus to say that a device lacks invention and that it is obvious is to state the same legal proposition in two ways. Application of Jacoby, 309 F.2d 513, 516, n. 3 (C.C.P.A.)." Id. 332 F.2d at 410.

"Novelty does not exist if the patented device has been anticipated by a prior device, whether patented or not. *In order to have anticipation, it is necessary that all of the elements of the patented device, or their equivalents, be found in a single prior device where the elements do substantially the same work in substantially the same way.* Firestone v. Aluminum Co. of America, 285 F.2d 928, 930 (C.A.6); Allied Wheel Products v. Rude, 206 F.2d 752, 760 (C.A.6); 1 Walker, Patents § 47, at 255 (Deller ed.). In other words, a device lacks novelty if there is, or has been, a substantially identical prior device." Id. 332 F.2d at 414. (Emphasis supplied.)

■ The patents in suit are "combination" patents, that is, they utilize elements or features of the prior art to accomplish their method or process.

Defendants cite Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162, and General Motors Corp. v. Estate Stove Co., 203 F.2d 912 (C.A.6), cert. den. 346 U.S. 822, 74 S.Ct. 37, 98 L.Ed. 348, for the proposition that a high standard of invention is required of combination patents.

■■ When all or many of the elements of a patent are old, one would expect that the standard of invention should differ from that required when new elements are disclosed. But the rule is well settled that:

"It is established law that all the elements of a combination may be old, Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 442, 31 S.Ct. 444, 55 L.Ed. 527, and, if the elements coacting produce a new and useful result, the combination is patentable. Coats Loaders & Stackers, Inc. v. Henderson, 6 Cir., 233 F.2d 915, 921; Colgate-Palmolive Company v. Carter Products, Inc., 4 Cir., 230 F.2d 855, 862, opinion by Chief Judge Parker." National Latex Products v. Sun Rubber Co., 274 F. 2d 224, 239, cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022.

See also Monroe Auto Equipment Co., supra, and Firestone v. Aluminum Co. of America, 285 F.2d 928 (C.A.6), cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87. Thus, the standard of invention to be applied to combination patents is whether or not a new and useful result or function is produced.

It is necessary, then, to view the patents here attacked with the foregoing legal principles in mind.

The 347 patent was granted on a process for treating the surface of a printing shell while backing material is being affixed to the rear of the shell.

In support of the claim of invalidity, defendants rely on the following patents: Cooper, 1,028,330; Smith, 1,297,266; Golrick, 1,720,727; and Droitcour, 1,009,-390.

■ Smith, Cooper, and Droitcour were not considered by the Examiner during the pendency of the 347 patent application. The presumption of validity of a patent is weakened if applicable prior art is not considered by the Patent Of-

fice. Harvey v. Levine, 322 F.2d 481 (CCA6, 1963); Aluminum Co. of America v. Sperry Products, 285 F.2d 911 (CCA 6, 1960), cert. den. 368 U.S. 890, 82 S. Ct. 139, 7 L.Ed.2d 87; France Mfg. Co. v. Jefferson Electric Co., 106 F.2d 605 (CCA6, 1939), cert. den. 309 U.S. 657, 60 S.Ct. 471, 84 L.Ed. 1006, reh. den. 309 U.S. 696, 60 S.Ct. 589, 84 L.Ed. 1036. Therefore, this court must carefully scrutinize the evidence to determine whether or not the unconsidered prior art offers sufficent disclosures to overcome the statutory presumption.

■ In applying the test of novelty to the 347 patent, it is clear that not one of the cited patents, taken individually, contains all the steps of the 347 patent, and therefore it is not invalid for lack of novelty.

■ The determination of invention, or lack of it, is a vexing one, but essential to the question of validity. Judge Phillips, in the Monroe Auto Equipment case, supra, provides an excellent discussion of the difficulty in defining "that abstraction which we call invention." He goes on to consider relevant authorities and then states three considerations in reaching a decision on invention:

> "First, a determination of what the prior art was; this involves factual questions. Secondly, there is a determination of what, if any, improvement the patentee has made over the prior art; this will usually turn on expert testimony and therefore is a question of fact. The final step is to determine whether the improvement would have been obvious to one skilled in the art." Id. 332 F.2d at 411.

This court shall apply these criteria to the patents in suit.

The state of the make-ready art, as stated in the opening facts, involved treating finished printing plates by either passing them through pressure rollers or by actually hammering on them. Testimony brought out during the trial of this case established these facts.

The only patent cited by defendants which deals with this make-ready art is Smith. In the Smith process, suffice it to say that the operation was involved and was accomplished by the gravitational pressure exerted against a shell by pouring molten backing material into a mold, at the bottom of which the shell was placed.

The 347 patent enabled the make-ready process and the backing operation to be performed in one step, without the complicated and cumbersome procedures embodied in the Smith patent, and as will be seen from the following discussion, this represented a clear advance in the art.

The last step in the test of invention is whether or not the advance made would have been obvious to one skilled in the art. The patents most heavily relied upon by defendants are Cooper, which involved a pressure casting concept, and Smith, which was concerned with the make-ready art. The machine of Cooper had been in existence since 1912, and the concept of the Smith patent was in existence and known to the trade in 1919. The patents had been issued on those respective dates.

Yet, in 1947 when the Myers 347 patent was granted, the idea of combining the casting and make-ready operations into a single process had not been obvious enough to the electrotype industry for use in the industry. Electrotype workers during that period continued to treat finished printing plates by hammering or rolling.

Thus, clearly it cannot be said that this was an obvious invention when it had not occurred to anyone in the industry standing to benefit from it. It might be noted here that defendants introduced no evidence from anyone skilled in the art to show that such a step was obvious.

■ The presumption of validity can be overcome only by clear and convincing proof, Patterson-Ballagh Corp. v. Moss, supra; Moon v. Cabot Shops, Inc., 9 Cir., 270 F.2d 539, cert. den. 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed. 546, and while the presumption is weakened in this

instance, it has not been overcome by the necessary proof.

 The 347 patent must be held to be valid.

The 856 patent is described in the opening statement of facts, and concerns itself with the flow of plastic in the manufacture of a lightweight printing plate laminate.

In applying the three-step test of patentability, the court again finds that utility is not a point in dispute.

As to novelty, none of the patents relied upon by defendants fully anticipate the steps of the 856 patent. Therefore, it withstands any attack grounded on lack of novelty.

In relation to invention, defendants rely on Frazier 2,133,981, and Davis, 2,-114,288, which were before the Examiner, and Scutt 2,379,544 and Lippincott 2,108,-822, which were not. Thus, as in the case of the 347 patent, the presumption of validity is weakened, and the court must more closely examine the granted patent.

The state of the art prior to the 856 patent was essentially similar for this and the remaining patents in suit—a lightweight, durable printing plate was highly prized in the industry, but had not been perfected.

Frazier, Davis and Lippincott deal with a metal shell, a layer of *solid* plastic, and a solid metal backing sheet. Thus, in all of them the problem heretofore discussed relating to lateral flow of the solid plastic and unevenness in the finished plate, would not present itself.

The advance made by the 856 patent resided in advances in coping with the problem mentioned above by replacing the solid plastic layer with a perforated layer, which absorbed excess plastic in a given area caused by compression during the laminating process and thereby did away with the necessity of allowing the plastic to flow freely over its entire area.

Defendants argue, however, that this step would have been obvious to one skilled in the art by reason of the disclosure in the Scutt patent of a perforated gasket-like layer in the manufacture of abrasive articles, such as grinding wheels.

 There is no question but that the Scutt patent does disclose a perforated layer for use in a bonding process. However, it is a well established principle in patent law that a patent cannot be invalidated by prior patents from a non-analogous art.

"With regard to analogous art, it is the rule that, though an inventor is conclusively presumed to know the prior art in his own and clearly allied lines of endeavor, he is not bound by what has been done in remote or nonanalogous arts. Ottinger v. Ferro Stamping & Mfg. Co., 6 Cir., 59 F.2d 640; Alemite Mfg. Corp. v. Rogers Products Co., Inc., 3 Cir., 42 F.2d 648. A reference, in order to be effective to disprove the novelty of an alleged invention, must relate to the same art as the questioned invention, or to an analogous or closely related art. Wallace v. Mandel Bros., Inc., 7 Cir., 164 F.2d 861. 'We are of opinion that whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts.' A. J. Deer Co., Inc. v. U. S. Slicing Mach. Co., 7 Cir., 21 F.2d 812, 813; Copeman Laboratories Co. v. General Plastics Corp., 7 Cir., 149 F.2d 962; Wallace v. Mandel Bros., Inc., supra." Allied Wheel Products v. Rude, 206 F.2d 752, at 755 (CCA6, 1953).

See also Monroe Auto Equipment Co. v. Heckathorn Mfg. & Supply Co., supra.

In the Monroe Auto Equipment case, supra, the court held that non-analogous arts could not be ignored if cited for "adaptation of well known scientific principles to practical uses" or to show a "common and generally known expedient in mechanical arts." Id. at 332 F.2d 413.

In the Allied Wheel Products case, supra, the court found hoeing, harrowing and cultivating to be analogous arts.

In the case of Sun Oil Co. v. Tubular Service & Eng. Co., D.C., 120 F.Supp 428, aff'd. 5 Cir., 220 F.2d 27, cert. den. 349 U.S. 947, 75 S.Ct. 876, 99 L.Ed. 1273, the court held that textile and shoe machinery patents on tubing calipers were not analogous arts for determining the validity of a patent on tubing calipers for use in the oil industry.

In the case at bar, the court can see no similarity in the elements and purposes of the abrasive tool art and the printing plate art. Furthermore, it does not appear to this court that the use of a perforated layer to combat the problem of unevenness in a finished laminate is either a well known scientific principle or a generally known expedient in the mechanical arts. No supporting evidence or testimony was submitted to rebut any of these conclusions, and the principles of law were not contradicted.

On the final test of invention—whether or not the advances made would have been obvious to one skilled in the art —there was nothing presented to the court by one skilled in the art to show that it would have been obvious at the time. Therefore, the fact that the plaintiff Myers did meet the problem in this way, when the industry was seeking a workable and durable printing plate, is strong evidence of invention.

"It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor." Expended Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 655, 53 L.Ed. 1034, 1039.

Moreover, the Examiner did consider Frazier and Davis in proceedings before the Patent Office, and since Scutt, the essential element of defendants' attack on validity, is from a non-analogous art, and Lippincott adds nothing of a material nature to Frazier and Davis, the validity of this patent must be upheld.

The 990 patent has also been discussed previously. It covers plaintiffs' basic process for making lightweight, laminated printing plates. The same test of patentability must be applied to this patent as to all others in suit.

For the invalidity of this patent, defendants rely on only one patent which was not before the Patent Office, that of Novotny, Patent No. 1,377,506. Novotny is cited for the use of a perforated backing plate. Other than this element, it has no relevance to the 990 patent, since it utilized a plastic printing shell, and the perforated backing plate was attached to the back of the plastic shell. Thus, the problem of eliminating "soft spots" and trapped gases did not confront Novotny.

For this reason and another occurring in the prosecution of the application before the Patent Office, which will be discussed presently, the court cannot find that the failure to consider Novotny detracts from the patentability of the 990 invention.

Utility is not in issue, nor is novelty seriously questioned, since again, no single prior patent discloses all the steps of the 990 patent.

Turning to invention, the state of the prior art is well known by this point in the opinion, and the focal point is the contribution to the art made by the 990 patent.

The use of a perforated backing plate shows another significant step in the continuing battle against "soft spots" and trapped gases.

 Lead backed plates dominated the industry and the efforts to develop a successful lightweight plate, as represented by the patents of Novotny, Frazier, Davis and Boutwell (Patent No. 2,355,949), made no apparent impact in the field. The widespread current use of a perforated metal backing in a lightweight plate in an industry which had been dominated by the old lead-backed plate is strong evidence of the contribution made by this patent.[1]

 The obviousness of the Myers combination is not apparent from the record of this case. The standard to keep in mind at this point is that set forth in Monroe Auto Equipment Co. v. Heckathorn Mfg. & Supply Co., supra:

> " * * * in considering the question of obviousness, we must view the prior art from the point in time just prior to when the patented device was made. Many things may seem obvious after they have been made, and for this reason courts should guard against slipping into use of hindsight. We must be careful to 'view the prior art without reading into that art the teachings of appellant's invention.' Application of Sporck, 301 F.2d 686, 689 [49 CCPA 1039]." Id. 332 F.2d at 412.

None of the patents relied upon by defendants for invalidity concern themselves specifically with the problem of the flow of plastic. It is therefore difficult to see in what way the combination of any of their teachings would be obvious in attempting to combat this obstacle.[2]

---

1. Plaintiffs' witness, Mr. Lynch, of Conde Nast Publications, testified as follows at page 470 of Volume 1 of the transcript: "We have been—More or less the electrotyping field has been in the horse and buggy days until these improvements started, which was about ten years ago, and I do believe that this Color-Line now is about the latest thing, or this plastic-backed plate is the latest thing they have come up with."
Defendants' witness, Mr. Ticehurst, testified that Curtis Publishing Co. had made 52,000 printing plates from plaintiffs' bases, and over 400,000 lightweight plates in all.
Finally, from 1960 through 1964, plaintiffs have sold over 3.2 million dollars in printing plate materials, which amounts to about 800,000 plates. (Answer to defendants' interrogatory #82.)
While commercial success itself is not proof of invention, it is a relevant consideration, and, when the question is close, supports a finding of invention. O'Leary v. Liggett Drug Co., 150 F.2d 656 (COA 6, 1945), cert. den. 326 U.S. 773, 66 S. Ct. 232, 90 L.Ed. 467, National Latex Products Co. v. Sun Rubber Co., supra.

2. As stated by Judge Learned Hand in the case of Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 155 F. 2d 937, 939:
> "Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable."
Judge Hand's language in a later infringement case is also worthy of note:
> "True, Woodfine's was not a major achievement; but it did add a convenient novelty to the typewriter, a machine on which a vast amount of ingenuity had been expended, and which had for long offered a place for just such an improvement. Moreover, although the record amply proves that 'margin stops' themselves had received much attention and been the subject of a number of patents, nobody had ever before worked out their automatic return; and that was a change which has proved of substantial service. We think this adequate testimony that, although its contrivance did not demand a high flight of inventive genius, it is entitled to be protected against so complete an appropriation as the defendant has made."
Royal Typewriter Co. v. Remington Rand, Inc., 168 F.2d 691, at 692, 693, cert. den. 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379, reh. den. 335 U.S. 864, 69 S. Ct. 129, 93 L.Ed. 410.

Furthermore, defendants submitted no evidence by anyone skilled in the art that such combination would be obvious.

Finally, this patent received extensive attention from the Patent Office. Boutwell, Davis and Frazier were considered, and Novotny, as mentioned, does not disclose any teaching striking enough to warrant a finding of invalidity.

This is especiallly so in view of the facts relating to the history of this patent (defendants' Ex. 61). The Examiner issued a final rejection, based substantially on the arguments now propounded by defendants. His decision was contested before the Board of Appeals of the Patent Office, on the grounds that even though the separate elements may be found in previous patents, the combination disclosed invention. The Board of Appeals granted the Letters Patent.

■ The presumption of validity is strengthened when the patent is granted after considerable scrutiny by the Patent Office and after review by the Board of Appeals. Universal Incorporated v. Kay Manufacturing Corp., D.C., 195 F.Supp. 241, aff'd. 4 Cir., 301 F.2d 140.

■ The court holds that the 990 patent is valid.

The last patent in suit is the 139 patent. The inventive concept is substantially and simply the use of a layer of fibrous material, such as cheesecloth, to provide an avenue of escape for air trapped behind the surface of the printing shell.

Utility and novelty are not in question, and validity turns again on the presence or absence of invention.

Defendants rely primarily on patents of Swan, 2,272,254, Lippincott, 2,108,822, Wilson, 2,139,054, and Davis, 2,114,288, and the fact that the latter three patents were not cited before the Patent Office.

Swan and Wilson relate to printing plates having plastic printing surfaces rather than metallic, and Davis and Lippincott located the fabric between the plastic and the backing layer of metal.

Those distinctions will be meaningful upon further analysis.

The Simon patent, 2,728,702, relating to the aircraft industry, while not heavily relied upon by defendants, is in any case inapplicable by reason of its being non-analogous and for the same reasons as the Scutt patent, supra, will not be considered.

The state of the art prior to the granting of the 139 patent is represented generally by the patents relied upon by defendants for invalidity.

The advance contributed by the 139 patent resided principally in further eliminating the problems caused by trapped air behind the surface of the printing shell.

The obviousness of the combination is claimed to be apparent by defendants, inasmuch as Swan clearly discloses use of fabric to vent gases and the fabric in Wilson accomplished a similar purpose.

The primary problem in this series of patents, most evident in the succession of the 856, 990 and 139 patents, is the bonding of a printing shell securely to the lightweight printing base in the most permanent manner possible without the accumulation or entrapment of gas behind the surface of the shell, which would cause soft spots or hollow areas behind the surface. Thus, while adhesion of itself is certainly not an innovation, the problem of finding a means of adhering a metal printing shell to a plastic backing to produce a printing plate capable of withstanding the forces acting upon it during operation on high speed printing presses was the key to a breakthrough in the printing industry.

The patents relied upon by defendants were not concerned with this problem facing Myers, for Swan and Wilson utilized plastic printing surfaces, and Davis and Lippincott placed the fabric at the rear of the printing base to afford a firmer bond at that location, and thus, inferentially at least, did not realize the problem, or were unable to solve it. The fact that none of these printing plates received wide acceptance in the industry,

while plaintiff's did, is indicative of the fact that they had not solved the problems of providing a workable, lightweight plate.

Swan is the patent most heavily relied upon by defendants, and it comes closest, in many respects, to the patent here attacked.

As noted, however, there is a notable distinction between the two. Furthermore, the Examiner fully realized the elements disclosed by Swan, and he too relied heavily upon the Swan patent, in combination with other patents, to show that the claimed invention was not new. (Defendants' Ex. 62, p. 21–22, pp. 34–35, pp. 40–42.) A final rejection was entered and an appeal of that decision was taken to the Board of Appeals of the Patent Office. Before a hearing was held by the Board, amendments were submitted as a result of a conference with the Examiner, and the patent in its present form was granted.

As stated, Swan was thoroughly considered by the Patent Office, and in view of the references there made to it and the other patents relied upon by the Patent Office, this court cannot find that the additional patents cited by defendants contain any disclosures of a significantly important nature to indicate that a different result would have been reached had they been considered.

Additionally, as stated by the Sixth Circuit Court of Appeals in Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828, cert. den. 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86, reh. den. 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245:

> "The best of the art relied on here was before the Patent Office and this fact strengthens the presumption of validity. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203, 205, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030." Id. 233 F.2d at 837.

The same situation exists in relation to the 139 patent.

Finally, the last bit of evidence showing that the invention contained in the 139 patent was not obvious is provided by Myers himself. The 990 patent application was filed in 1954. Not until 1959, five years later, was the application for the 139 patent filed, directed basically to the same problem which was the subject of the 990 patent.

Thus, the inventor himself did not come upon this concept until five years after the concept shown in the 990 patent. The existence of the 856 and 990 patents, as well as all the prior art patents cited by the Patent Office and the defendants, did not aid others involved in this field in a search for the solution to this problem.

One witness in a related proceeding before this court characterized the electrotype department of the printing industry as a "dying portion of that industry." Nonetheless it is apparent from the fact that six companies have contributed a total of $15,000 to the defense of this action (Pl. Ex. 100, pp. 32, 35) that there is a great deal of importance attached to the lightweight printing plate. Testimony revealed clearly that there had been extensive research carried on by the industry in an attempt to develop a workable lightweight plate.

The use of cheesecloth in the manner of the 139 patent is the most current refinement of the lightweight plate pioneered and developed by plaintiffs. When a problem such as this has existed for a long period of time and has been the subject of attention by the industry, a remedy discovered which enjoys commercial success is weighty evidence of invention. National Latex Products Co. v. Sun Rubber Co., supra, Lincoln Stores v. Nashua Mfg. Co., 1 Cir., 157 F.2d 154, cert. den. 329 U.S. 811, 67 S.Ct. 623, 91 L.Ed. 692.[3]

---

3. To again quote the eminent Learned Hand:

"Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they

Defendants argue that the court's failure to allow use of the 990 patent to invalidate the 139 patent was error. The Patent Office considered the 990 patent in the prosecution of the 139 patent application and did not find that it disclosed the invention of the 139 patent, either by itself or in combination with other patents cited by the Patent Office most notably Swan.

■ Furthermore, under 35 U.S.C.A. § 282, notice in writing to the adverse party of intent to rely upon prior patents in actions involving validity or infringement is required. Such notice was not given in this case, and the court accordingly sustained objection to the admission of the 990 patent for this purpose.

Defendants urge that the plaintiffs were fully aware of the 990 patent and that the court could have taken judicial notice thereof. The Fifth Circuit Court of Appeals considered this same question in the case of Thermo-King Corp. v. White Trucking Service, Inc., 292 F.2d 668. The same argument was advanced and accepted on the trial court level. However, the lower court decision was reversed on appeal, and the following language is pertinent to the question under consideration:

"This statute, just as interrogatories, requests for admissions, and the like under the Rules, is intended to do more than alert an adversary to the existence of evidence. It enables the plaintiff to know what sort of defense is going to be asserted. In a very real sense it determines what is to be tried." Id. at 675.

The court then goes on to explain the great importance of careful and detailed preparation in the trial of technical and complicated questions of patent litigation.

The failure to give notice in this case could have seriously prejudiced plaintiffs' case had the court allowed the evidence in controversy to be admitted. The statute and case law provide ample authority for the court's action, and in view of the facts of this case, the court can see no reason to depart from its earlier ruling.

■ Finally, defendants contend that the 139 patent is invalid for failure to file a supplemental oath, citing 35 U.S.C.A. §§ 111, 115. Supplemental oaths are mentioned in a supplemental note to § 115, relating to Rules of Practice of the Patent Office, specifically 37 C.F.R. § 1.67, which reads in relevant part as follows:

"Supplemental oath for matter not originally claimed

(a) When an applicant presents a claim for matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath to the effect that the subject matter of the proposed amendment was part of his invention; * * *."

The language of this rule indicates that the court must now determine whether or not any claim of the issued patent was "substantially embraced in the statement of invention or claim originally presented."

The 139 application contained what Myers regarded as two patentable concepts: a plastic-backed plate (by "sandwiching" the perforated metal between two layers of plastic) and the cheesecloth concept. The Patent Office granted a patent only on the cheesecloth concept, so the original claims, containing a

had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and—perhaps the most important of all —the extent to which it superseded what had gone before." Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937, 939.

plastic-backed metal sheet, were replaced by the claims of the issued patent, which differ essentially only in that they do not include the plastic backing layer.

Thus, the question is: does the statement of invention or claim originally presented substantially embrace the matter presented in the claims of the issued patent, i. e., the use of cheesecloth to vent gases?

Obviously, the only real difference in the two sets of claims is the elimination of the plastic backing in the final claims. Specifically, however, the original specification (Def. Ex. 62) contains the following language at Page 3: " * * * one of the principal objects of my invention is to provide a method of producing laminated printing plates that eliminates objectionable air or soft spots directly to the rear of the printing shell."

And at Page 7: "[However, the main purpose of the use of the cheesecloth or like is that it is capable of absorbing entrapped particles of air at the back of the irregular surfaces of the printing shell.]"

Lastly, the use of the cheesecloth is clearly set forth in all six of the original claims.

Under the language of the rule, there was no requirement for a supplemental oath in this patent.

 The court upholds the validity of the 139 patent.

Myers' step by step development of a lightweight printing plate, from the 856 patent through the 139 patent, had astonishing results and astounding impact on the printing industry. After years of work, Myers succeeded where others failed. These developments were the products of patience, study, experiment, and research by an inventive and creative mind. They were not merely aggregations by a skilled mechanic.

Myers' various combinations of old elements produced new qualities and functions, new processes and new products.

 The cases of Cold Metal Process Co. v. Republic Steel Corp., supra, and Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343, syllabae 2, 3 at page 347, cert. den. 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529, are startling illustrations of the fact that combinations which appear simple may, by reason of the impact which they have in their given fields, obtain patentability.

## II. INFRINGEMENT:

The next topic for consideration is infringement, it being the claim of plaintiffs that all four of the patents in suit have been infringed by defendants.

Relative to the 347 patent, the question of infringement is comparatively simple. This patent was granted on a make-ready process, and consisted of three claims showing a method of making curved printing plates, whereby the make-ready process was accomplished during the casting operation.

Claims 1 and 2 of the patent call for the use of a pressure casting machine in this process, while claim 3 calls for the use of a centrifugal casting machine.

Defendants perform all of the operations involved in the process described in claims 1 and 2 of the 347 patent (claim 3 is not in issue). The question for decision is whether or not the machine used by defendants in this process, admittedly not a centrifugal casting machine, is a "pressure casting machine" of claims 1 and 2, or whether a "pressure casting machine" must be taken to be only a centrifugal casting machine.

Defendants' machine is technically a laminating machine, containing a curved molding compartment into which the component materials of the printing plate are placed. The make-ready sheet is used in exactly the same way as in plaintiffs' process.

The hinged top of the machine, which is curved to fit tightly into the curved molding compartment, contains an inflatable diaphragm, and when the top of the machine is closed and heat and pressure are applied, the laminating process is accomplished and the make-

ready process is achieved at the same time.

■ The court can see no reason to apply claims 1 and 2 of the patent only to a process involving a centrifugal casting machine when the words of those claims are "pressure casting machine," and only claim 3 refers specifically to a centrifugal casting machine. It would have been an easy matter to use the same term throughout the application, and since this is not the case, it must be assumed that the use of two different terms indicates that two different meanings are intended.

Plaintiffs further argue, with strong logic, that the use of a centrifugal casting machine in claim 3 was intended to satisfy the requirements of 35 U.S.C.A. § 112, which requires that the best mode of carrying out the invention be set forth.[4]

Any lingering doubts are resolved by reference to the patent itself (Def. Ex. 6). At page 6 of the application (specifications), Mr. Myers said:

"*Any suitable method may be employed to back the shell,* such as by injection molding, centrifugal molding, or like. In the drawings I show a centrifugal casting machine which I have designed especially for this work, and which I will now describe." (Emphasis supplied.)

No patent was granted on his machine, but the specifications at page 8 again point out that the inventor distinguished between a centrifugal casting machine and a pressure casting machine when it is said that "(a masking process) provides for the successful use of various sizes of printing plates in a given pressure casting machine." The specifications go on to say that an advantage of *his* machine is that the centrifugal pressure can easily be regulated. .

Thus, it is obvious that the inventor did not mean to limit his process to one machine only, and the language of the claims is clear on this point.

■ The court finds that the patent embraces a make-ready process performed on pressure casting machines other than a centrifugal casting machine, and that the defendants' laminating machine, while performing the make-ready process at the same time as it uses pressure and heat to place castable material at the rear of the printing shell infringes claims 1 and 2 of patent 347.

With reference to the 856 and 990 patents, essentially the same determination is required to decide whether or not there has been infringement, and that is, whether or not defendants do use an adhesive between the layer of plastic and the layer of backing metal. Claim 3 of the 856 patent[5] and claim 2 of the 990 patent[6] are involved.

4. § 112 Specification
 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, *and shall set forth the best mode contemplated by the inventor of carrying out his invention.* (Emphasis supplied.)

5. Claim 3 of the 856 patent states:
 The method of making printing plates comprising, the taking of a metallic printing shell, applying adhesive to the back of the printing shell, applying a sheet of perforated thermoplastic material on the adhesive coated printing shell, placing a sheet of light metal on

the free side of said thermoplastic material, with an adhesive therebetween heating the assembled plate and compressing the assembled plate in a press of limited travel, whereby when said assembled and heated plate is compressed the perforations of the moldable thermoplastic material will compensate for localized irregularities in the finished plate by the surplus material filling its own perforations in that area and thus not affecting the remaining areas of the sheet of thermoplastic material.

6. Claim 2 of the 990 patent states:
 The method of making printing plates, comprising, the taking of a metallic printing shell, applying adhesive to the back of the printing shell, placing a sheet of resin plastic material on the adhesive-

The 856 patent differs from the 990 patent in that perforated plastic and a solid metal backing plate are used,[7] and the assembled plate is heated and compressed in a press of "limited travel."

The specific language of claim 3 of the 856 patent recites merely that the assembled plate be compressed in a press of limited travel so that when compression is effected localized irregularities in the plate are compensated for by reason of surplus plastic filling its own perforations in that area.

 Defendants' machine is, within the language of the claim, a "press of limited travel," and as the United States Supreme Court declared in the case of Graver Tank and Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097:

> "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

However, defendants claim that reference to the specifications discloses that a press of limited travel is one which definitely determines the thickness of the finished plate. Although the principal object of the patent is stated to be a light and strong printing plate of minimum thickness, (Def. Ex. 60, p. 3) the specifications go on to say that a further object is production of a plate which eliminates the necessity for shaving to the proper thickness. This is done by placing small blocks or stops between

the two faces of the press so that the finished plate is of the same thickness as these blocks. There is no special press involved and as mentioned above, the claims do not specify that the press must produce plates of predetermined thickness.

 However, even were defendants' arguments on this point to prevail, under the doctrine of equivalents, their machines would come within the scope of claim 3. If a device performs substantially the same function in substantially the same way to accomplish substantially the same result as a patented device, the patentee may maintain an action for infringement. Graver Tank and Mfg. Co. v. Linde Air Products Co., supra.

The diaphragm in their machine is inflatable and the pressure can be controlled between 0 and 100 pounds. (Pl. Ex. 96, p. 60). This pressure is exerted uniformly over the entire surface to be compressed, which makes it more desirable than other types of presses, where pressure is greater at high points in the face. (Tr. p. 200–201, Vol. I). By regulating the pressure, therefore, plates of varying thickness can be obtained (Pl. Ex. 96, pp. 60–62).

If a press of limited travel is then what defendants say it is, their own machine, under the doctrine of equivalents, fits the description. In presses in which pressure is not easily controlled, the proper pressure is obtained through the use of the restraining blocks, machined to the proper thickness. However, where pressure is easily controlled, as in defendants' press, the same result can be achiev-

coated printing shell, placing a sheet of perforated light metal on the free side of said resin material with an adhesive therebetween, heating the assembled plate in a press, whereby when said assembled and heated plate is compressed, the resin material will compensate for irregularities in the areas of the plate by passing into certain of the perforations of the metal plate without affecting the remainder of the sheet of resin material, the total area of said perforations being effective when the sheet is compressed in

said press to receive any surplus of plastic material but insufficient to weaken the structure of the plate, the entrance of said resin material into said perforations forming an additional bonding means for securing the resin material and metal sheets together.

7. Defendants used perforated plastic only from the period of April 1960 to August 1961, and insofar as that patent is concerned the claimed infringement can relate only to that time.

ed in the same way without the use of the stops.

■ Equivalency is determined with references to all pertinent facts, such as the patent itself, prior art, and the circumstances of the case, and absolute identity is not required. Graver Tank and Mfg. Co. v. Linde Air Products Co., supra.

It has already been shown that the 856 patent represented an important advance in the printing industry, and excluding the press of limited travel, defendants used every element of the disputed claim.

The facts of this use show that plaintiffs' patents have pioneered the development of a lightweight printing plate and that the inventions have captured the attention of the industry. There is no doubt in the mind of this court that the purpose of defendants' machine is to escape the infringement of the 856 patent by attempting to vary the process by which the plate is made. As stated at the outset of this discussion, the process nonetheless comes within the scope of the language of claim 3, and even if defendants' position is tenable, in so doing they have not avoided the application of the doctrine of equivalents.

At this point in the opinion, the remaining question of claim 3 of the 856 patent and of claim 2 of the 990 patent, will be considered.

Specifically, as previously mentioned, it deals with the method of adhesion between the plastic layer and the perforated metal plate of the 990 patent.

The claims of both patents expressly call for an adhesive between the plastic layer and the metal backing plate.

It is the claim of the defendants that the adhesion between their plastic and backing plates (apparently perforated plates were used with both solid and perforated plastic) is accomplished by means of a mechanical lock, while plaintiffs assert that the plastic used by defendants is an adhesive within the meaning of the language of the claim, that it combines the separate functions of plastic and adhesive in a single step, which does not avoid infringement, Royal Typewriter Co. v. Remington Rand, Inc., supra, Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Co., 230 F. 120 (CCA 6, 1915); see Detroit Showcase Co. v. Kawneer Mfg. Co., 250 F. 234, 237 (CCA 6, 1918); and finally, that under the doctrine of equivalents, the patent is infringed.

Plaintiffs' plastic is a material known commercially as Teneled No. 565. Defendants' plastic is a product known as Teneled No. 4.

The perforations in the aluminum backing plates are somewhat bell-shaped and it is defendants' theory that during the molding and casting process, the plastic becomes fluid and flows into the perforations in the aluminum through the narrow end of the "bell" and upon cooling and hardening, "locks" the entire base together by means of this mechanical phenomenon.

Defendants' position is greatly weakened by testimony in the depositions of William Hayes (Pl.Ex. 102, p. 41–2), who worked with defendant Preston and Bista, Inc., another company engaged in producing printing plates, Robert Anderson (Pl.Ex. 98, p. 8), superintendent of defendant Crescent Engraving's electrotype department, and defendant Preston himself (Pl.Ex. 96, pp. 53–4). All indicate that the position of the "bell" in the plate did not affect it—the assembly remained intact regardless of whether the bell was up or down.

Plaintiffs' expert witness, Dr. Robert Patrick, explained specific adhesion as being that area of the adhesion phenomenon which is chemical and physi-chemical in nature. He distinguished specific adhesion from mechanical lock by stating that the former requires some sort of chemical interaction between the materials being bonded together. (Tr. p. 112, Vol. I.)

At this point, it might be well to mention some of the qualifications of plaintiffs' expert, who received a Ph.D in

chemistry in 1951. He worked as a research chemist and then in 1954, and since that time, concentrated on the field of adhesion. From 1954 to 1960 he worked in this area of chemistry, working during that time, among other things, on classified government research projects concerned with adhesion.

In 1960 he started his own research and development company, which is his present place of employment. About forty per cent of its effort is in research for the government. He has published many of his papers in scientific journals and is presently working with others on a three-volume treatise on adhesion for the Gordon Research Conference, which is sponsored by the American Association for the Advancement of Science. (Tr. p. 65–75, Vol. I). These qualifications, and the competence and facility with which he testified, left a deep impression on the court.

Dr. Patrick conducted tests with perforated aluminum and Teneled No. 4, the plastic used by defendants, and found that a pressure of 605 pounds per square inch was required to force the plastic from the perforations with the bell in an inverted position (Pl.Ex. 144; Tr. pp. 134–6, Vol. I), and stated that the test was an illustration of the specific adhesion obtained by use of the plastic material. On one of defendants' production plates (Pl.Ex. 163) which had had a portion of the aluminum shaved away in the plate-making process, a force of 195 pounds per square inch was required to remove the plastic, again with the bell in an inverted position.

Dr. Patrick testified that an adhesive was "a substance capable of holding materials together by surface attachment" (Tr. p. 158, Vol. I), and that in his opinion the Teneled No. 4 used by defendants was an adhesive (Ibid.). A test he conducted showed that a force of 243 pounds per square inch was required to break the bond between aluminum and a layer of Teneled 565, used by plaintiffs, *when a layer of Teneled No. 4 was placed between*

*those two substances to bond them.* (Id. at 134).

His research also indicated that Teneled No. 4 was highly filled with wood flour, or filler. The significance of this fact in the field of adhesion was explained as follows: plastics contain substances called plasticizers which tend to migrate through the plastic toward the interphase, or point of contact between the plastic and the material to which it is bonded. This migration tends to cause a certain shrinkage of the plastic (the amount of shrinkage is designated by a figure known as the coefficient of expansion) and unless the other material shrinks at the same rate, a strain is exerted at the bonding line and the adhesion is weakened. By the use of a filler, such as wood flour, in the plastic, the migration of the plasticizers is inhibited, this shrinkage does not occur and the process of adhesion is not affected. (Id. at 96–103.)

The evidence produced through the testimony and tests of Dr. Patrick has convinced the court that the Teneled No. 4 used by defendants in their manufacturing process was an adhesive within the meaning of claim 3 of the 856 patent, and claim 2 of the 990 patent. Therefore, the court finds that both patents are infringed.

Defendants introduced no scientific evidence or tests which were sufficient to overcome the compelling testimony of Dr. Patrick. As a matter of fact, defendants' expert witness had never heard the term "specific adhesion" prior to Dr. Patrick's testimony. (Tr. p. 384, Vol. I.)

The remaining patent, the 139, involves the use of cheesecloth, as mentioned previously. Defendants literally infringe all eleven claims of this patent.

It is significant that in a preliminary report prepared by defendants' counsel, which report was later distributed to the Curtis Publishing Co. and others involved in the defense of this suit, the following statement was made:

"Patent 3,062,139. This is the so-called 'cheesecloth' patent. As we now see it, Crescent appears to come within the scope of the claims of this patent and hence the best defense that we can see at the moment is to attack the validity of the patent." (Pl.Ex. 172, p. 2).

Defendants' argument relative to infringment of this patent again asserts the position taken with regard to its validity. The court has already decided validity and now finds that the 139 patent is also infringed by defendants.

Defendants and their associates in suit have appropriated, applied and taught each of Myers' inventions. They are infringers.

## III. PATENT MISUSE:

Defendants' final line of argument is that, even assuming the patents are valid and infringed, plaintiffs may not assert infringement by reason of patent misuse.

This defense comes down to a charge that plaintiffs' practice of selling both assembled bases and component materials with a license to practice the patents, as well as outright licenses to practice the patents upon payment of specified royalties, left prospective purchasers uncertain as to the amount of royalty paid when materials were purchased from outside sources.

Sales of this separate material amounted to only two per cent of total sales volume and involved only two of plaintiffs' customers. (Tr. p. 48, Vol. I.)

On September 24, 1964, before the commencement of this trial, a memorandum was issued to the employees of Printing Plate Supply Co., stating that:

"Effective today, the Printing Plate Supply Co. will provide only assembled printing plate bases to its customers for use in the 'color line' processes, and any orders for separate plate base materials received after today will be returned with an

appropriate indication of this new policy." (Pl.Ex. 126).

A supporting affidavit was submitted to the court on June 29, 1965, stating that this policy had been in effect since the date of the memorandum and that every customer who had ordered the raw materials had been advised that they were no longer available from Printing Plate Supply Co.

By adopting this policy plaintiff did not mean to assent to the proposition that it was guilty of patent misuse, but as Dr. Redding stated from the witness stand, this portion of the business had merely been a service to their customers and was actually a nuisance to them, and when defendants' pretrial brief made it clear that this would be a point of some controversy, the entire operation was dropped. (Tr. p. 48–9, Vol. II.)

Patent misuse can be absolved if the objectionable practice has been abandoned and its effects fully dissipated. See B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367.

The Sixth Circuit Court has stated this principle in the cases of White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694, cert. den. 346 U.S. 876, 74 S.Ct. 128, 98 L.Ed. 384, when the patentee purged itself of the illegal practices *during pendency of the proceedings*, and where it was not shown that the nuisance had illegal consequences, and Campbell v. Mueller, 159 F.2d 803, 806–807.

The following quotation from Sperry Products, Inc. v. Aluminum Co. of America, D.C., 171 F.Supp. 901, aff'd. in part, rev'd. in part, Aluminum Co. of America v. Sperry Products, Inc., 6 Cir., 285 F.2d 911, cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87, while lengthy, is pertinent for the factual similarities and the expression of the points of law involved:

"In view of the foregoing authorities, it must be held that the restrictions in the leases were valid. Even if this were not so, and if it were

held that such restrictions constituted a misuse of the patents in suit, defendants would have no cause for complaint. As shown above, the practice of leasing was discontinued at the end of 1955 and since that time the angle beam search units have been sold without restriction.

"The reason for the abandonment of said practice was stated by Manning, assistant to the president of Sperry, as follows: 'We found that it just wasn't worth the bother. Of course our interest in leasing in the beginning was to protect a very substantial investment in the research and development applying to this rail and we concluded this just wasn't worth the bother and we were willing to open it up to anybody.' Manning testified further that the search units were easy to make and were being made by many people. If, contrary to the views hereinabove expressed, it were held that the restrictive leasing of the search units was improper, the abandonment of such practice would remove any impediment to plaintiffs' right to proceed with their suit for infringement. Defendants argue that since such practice was in effect at the time this suit was instituted and for some time thereafter, it is too late for Sperry to purge itself. This is not the law. In White Cap Co. v. Owens-Illinois Glass Co., 6 Cir., 203 F.2d 694, 698 the Court said:

'However, the master held that the plaintiff had purged itself of the illegal practice. The fact that the objectionable provision was cancelled during the pending proceedings does not establish that the holding is erroneous. Campbell v. Mueller, 6 Cir., 159 F.2d 803. See also Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, in which the illegal clauses were cancelled a short time before the entry of the decree.'

"To the same effect are Sylvania Industrial Corp. v. Visking Corporation, 4 Cir., 132 F.2d 947; Air Products, Inc. v. Boston Metals Co., D.C., 98 F.Supp. 719; Eastern Venetian Blind Co. v. Acme Steel Co., 4 Cir., 188 F.2d 247." Id. at 171 F.Supp. 931.

▬ Thus, it is clear that abandonment of an alleged illegal practice can obviate patent misuse. In the instant case, it is clear that plaintiffs have abandoned the practices complained of.

On the question of dissipation of illegal effects, there has been no showing that there were illegal effects.

There are assertions by defendants that customers of plaintiff *could* be confused by the price and licensing practices of plaintiffs, but no showing that any in fact were. This would have been a fairly simple fact to show since only two customers of plaintiff are in that position.

Furthermore, plaintiffs contest this assertion by defendants. Defendants rely upon Barber Asphalt Corp. v. La-Fera Grecco Contracting Co., 3 Cir., 116 F.2d 211, and Dehydrator, Ltd. v. Petrolite Corp., 9 Cir., 117 F.2d 183, as legal authority for their contentions.

Those cases deal with situations in which licensees of patentees could not know beforehand whether the royalty paid would be greater or less when materials for the patented article were purchased from sources other than the licensor or patentee. This in effect encouraged purchase of the materials from the licensor or patentee, which constituted patent misuse.

As plaintiffs show, the purchase of plastic and aluminum from outside sources will always result in the royalty being *lower* than if those materials are purchased from Printing Plate Supply Co. This is so because Printing Plate charges its royalty at the rate of $.40 or $.45 per 100 square inches of printing *base*, depending on the thickness thereof, where-

as the royalty charged on materials purchased elsewhere is at the rate of $.40 or $.45 per 100 square inches of printing *plate*, again depending on the thickness. Since a base is nearly always larger than a finished plate, and is never smaller, by reason of the fact that a base is trimmed to exactly fit the given printing shell, the royalty on material purchased from Printing Plate will always be at least equal to, if not more than that charged on material purchased elsewhere. Thus, the rule of the two cases relied upon by defendants does not apply to the facts of this case, since there is no incentive to purchase materials from Printing Plate in this case; if anything, the opposite is the result.

Defendants' mistaken reliance on those cases is shown by the statement at page 26 of their brief: "The question of which (royalty) is greater or lesser is not important—*the point is that they are different.*" The cases simply do not support this view.

The court finds that the facts do not sustain a holding of patent misuse in this case. However, if it should be held that the facts do compel such a conclusion, plaintiffs have purged themselves of any such patent misuse by the abandonment of the allegedly illegal practice, and are not barred from maintaining the suit.

The holding of the court is, therefore, that Patents No. 2,507,347, 2,800,856, 2,814,990, and 3,062,139 are valid and infringed; further, that there has been no patent misuse on the part of plaintiffs in connection with the latter three patents.

An order may be entered granting plaintiffs the injunctive relief prayed for, as well as an accounting.

Decision on the question of treble damages, costs, and attorney fees is withheld pending the accounting.

This opinion constitutes Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.