**PANDUIT CORPORATION, Plaintiff,**

v.

**STAHLIN BROS. FIBRE WORKS, INC.,**
**Defendant.**

No. 4935.

United States District Court
W. D. Michigan, S. D.

April 11, 1969.

Petherbridge, O'Neill & Aubel, Chicago, Ill., Roy E. Petherbridge, Chicago, Ill., Price, Heneveld, Huizenga & Cooper, Grand Rapids, Mich., for plaintiff; Peter P. Price, Grand Rapids, Mich., of counsel.

Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., John D. Simpson, Chicago, Ill., Schmidt, Smith & Howlett, Grand Rapids, for defendant; Richard L. Spindle, Grand Rapids, Mich., of counsel.

## OPINION

FOX, District Judge.

This is a patent infringement action brought by Panduit Corporation, a Delaware entity, with its principal place of business in Illinois (hereinafter plaintiff or Panduit), against Stahlin Bros. Fibre Works, Inc., incorporated and doing business in Michigan (hereinafter defendant or Stahlin Bros.). Plaintiff, owner of Kurt R. Walch U. S. Letters Patent No. 3,024,301, by mense conveyances (hereinafter Walch patent), alleges infringement of its patent by defendant.

The Walch patent teaches a wiring grille to be utilized in the wiring of control systems for electrical equipment. Plaintiff asserts that the defendant's "Loc" slot duct and "Web" slot duct infringe the Walch patent.

The action is brought pursuant to the patent laws of the United States, 35 U.S.C. § 281 et seq. The court has jurisdiction under 28 U.S.C. § 1338.

## I. FACTUAL BACKGROUND.

The control system of electrical equipment, in general, consists of a multitude of electrical components, such as relays and terminals, connected by a number of electrical wires. In order to facilitate the fabrication, subsequent revision and repair of these control systems, common practice is to install the electrical components and interconnecting wires in a metal enclosure. This entire assembly is known as an electrical control panel (shown in PX–41 and PX–66A–F). ("PX" refers to plaintiff's exhibit; "DX" refers to defendant's exhibit.)

Normally, the control panel is prefabricated as a separate unit and subsequently connected to the equipment, such as automated production line machinery, which it will control. After the control panel is joined to the machinery, the integrated unit is tested and any malfunctions corrected. If any later changes are made in the machinery or its mode of operation, changes often are also necessary in the wiring of the control panel.

Several techniques were in use before 1954 for wiring control panels, but no technique provided a satisfactory way to wire, repair and revise the control panels efficiently.

One of the earliest techniques was the "flat wiring" method in which each wire was laid flat against the back wall of the control panel. Multiple wires, running side by side in a parallel manner, were attached to the back wall. This method provided an attractive and a rather accessible panel; however, it required skilled craftsmen, was rather costly and required an inordinate amount of space.

With the development of more complex control panels, the number of electrical interconnections increased, requiring the use of more connecting wires. The space requirements of the "flat wiring" method were prohibitive and the "tied" or "laced" cable or harness method came into common usage. With this method, the wires were installed loosely on the panel between the components. After the wires were installed, they were tied or laced together with a cord or cable. Although this method saved space, it required skilled craftsmen to make a neat installation and was very time consuming. One of the difficulties with lacing was the problem of physically tracing an installed wire. Removal and replacement of a wire were also difficult.

These two methods, flat wiring and tied or laced harness, were in common use by the late 1920's, and their shortcomings were recognized by people in the industry who were constantly searching for solutions. (Testimony of Luc, Caveney, Taylor and Walch.)

After much trial and error, General Electric produced a steel grille which had perforated round holes through which wires were threaded (PX 63A). This device was patented in the 1930's (PX 67–6A and PX 62 at 50–53). Another product in use in the early 1950's was a U-shaped wiring duct (PX 2) which incorporated multiple openings in the side walls through which wires were threaded and then connected to the electrical components.

However, ducts with holes also had shortcomings. When these ducts were filled with wires, the wires were rather inaccessible and it was difficult to trace individual wires or to revise the wiring. For example, to remove any wire from the duct, it was necessary to disconnect the wire and thread it back through the hole. If the wire was not near the top of the duct, it was frequently necessary to remove a number of wires to gain access to the wire being traced or rerouted.

Kurt R. Walch, an employee of General Electric Company since 1926, was involved with electrical control panels

and thoroughly familiar with the problems involved in flat wiring, tied or laced harness and round hole duct wiring techniques.

Mr. Walch, in 1953, as a senior advance engineer at General Electric, was given a broad assignment to improve wiring practices, including the improvement of wiring duct design. Four desirable functions or results were stressed by Mr. Walch in his work on the design of an improved wiring duct:

(1) Easy insertion of wires in the duct;

(2) Prevention of accidental removal of wires from the duct;

(3) Provision of maximum useful space for leading wires out of the duct; and

(4) Facilitation of intentional removal of wires from the duct.

Mr. Walch in March of 1954 proposed an open slotted grille having parallel sides of flexible fingers with a restricted throat at the top (PX 20 at pg. 20D) (hereinafter the Walch grille). In March or April of 1954, he constructed a number of test grille models (PX 63) of soft copper wire. He selected the model having parallel spaced slots, flexible fingers and restricted passages at the open ends of the slots (PX 63) as the best. A patent application was filed on the Walch grille in October 1955, which ultimately resulted in the issuance of the Walch patent in suit.

Jack E. Caveney, president of plaintiff, is an electrical engineer who has engaged in the design and use of electrical control systems for many years. His experience in this field is both theoretical and practical. He has been engaged in design, correction and revision of control panels at both the source of manufacture and at field installations. In 1955, Mr. Caveney designed a wiring duct for control panels and, on a part-time basis, started a predecessor company of plaintiff to manufacture this wiring duct (hereinafter Panduit duct). This duct was similar to the Walch invention but had solid fingers instead of fingers formed of wire. In February of 1956, Mr. Caveney filed a patent application on the Panduit duct.

Walch

Panduit

In 1959 the Patent Office suggested to both Mr. Walch and Mr. Caveney that they copy a claim into their respective patent applications for the purpose of determining which of them was the inventor of the subject matter of the claim. Each copied the suggested claim into his patent application and the Patent Office then instituted an interference proceeding based on this claim. Mr. Walch was awarded priority of invention. He was therefore entitled to this claim in interference and the Walch patent was issued March 6, 1962. Mr. Caveney filed a motion during the interference urging that Walch could not make the count in interference because of his wire constructions, but the Patent Office ruled that Walch could make the count. This claim in interference became claim 5 of the Walch patent in suit.

The heart of Panduit's business was the patented duct, and in order to protect its investment Panduit purchased the Walch patent from General Electric.

Mr. Caveney also continued to prosecute his application to obtain whatever additional patent protection he could on the details of the Panduit duct. This was done to determine whether he was entitled to any additional patent protection. The court finds that he proceeded in a reasonable and prudent manner

Mr. Caveney argued before the Patent Office examiner that although the Walch patent covered the basic invention, the solid plastic finger of the Panduit duct was a patentable improvement over the wire fingers of Walch. The examiner refused to adopt this argument and held that the Panduit duct was not patentable over the Walch patent.

Mr. Caveney appealed the examiner's decision to the Patent Office Board of Appeals and the United States Court of Customs and Patent Appeals. In 1967, the United States Court of Customs and Patent Appeals affirmed the Patent Office's rejection of the Caveney patent application, concluding that the Walch duct had all but one of the four listed advantages of the Caveney duct, that the commercial success of the Caveney duct embodied the Walch invention, and that the commercial success of the Caveney duct was attributable to those features of the Panduit duct covered by the Walch patent for which priority was awarded. In re Caveney, 386 F.2d 917.

Plaintiff now sues defendant Stahlin Bros., claiming defendant's Loc-Slot and Web-Slot ducts infringe claim 5 of the Walch patent. Claim 5 reads as follows (PX 30) (and Fig. 2, PX 27):

*Fig. 2.*

Walch device

A wall for supporting and orienting wires comprising

—a side wall (19, 20)

—having longitudinally spaced substantially parallel slits (22)

—open at one edge of said wall (25)

—and defining substantially parallel edges (19) on longitudinally spaced fingers (19, 20)

—the free ends of said fingers (20) being enlarged

—to narrow the outer ends of the slits and provide restricted passages for the wires between the finger ends and thereby prevent accidental removal of the wires from between the fingers,

—said fingers being flexible to permit their deflection and provide wider fingerspacing at their free ends to facilitate positioning and removal of wires between said fingers.

It is interesting to note that this is the claim proposed by the Patent Office in the interference proceeding between Walch and Caveney (PX 28, pg. 48).

Defendant raises the defenses of invalidity and non-infringement; each is considered in separate parts of this opinion.

## II. VALIDITY.

■ In general, in any action in which the validity of a patent is attacked, there is a strong presumption of the validity of the patent issued by the United States Patent Office. 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401 (7th Cir. 1950), cert. den. 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369 (1950); Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855 (4th Cir. 1956), cert. den. 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956), reh. den. 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120 (1956); Printing Plate Supply Co. v. Crescent Engraving Co., 246 F.Supp. 654 (W.D.Mich. 1965) (hereinafter Printing Plate).

■ This presumption of validity is weakened if applicable prior art is not considered by the patent office. Harvey v. Levine, 322 F.2d 481, 484 (6th Cir. 1963); Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911 (6th Cir. 1960), cert. den. 368 U.S. 890, 82 S.Ct. 142, 7 L.Ed.2d 87 (1961); France Mfg. Co. v. Jefferson Elec. Co., 106 F.2d 605 (6th Cir. 1939), cert. den. 309 U.S. 657, 60 S.Ct. 471, 84 L.Ed. 1006 (1940), reh. den. 309 U.S. 696, 60 S.Ct. 589, 84 L.Ed. 1036 (1940); Printing Plate, supra. See also Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1937); Royal Patent Corp. v. Monarch Tool & Mfg. Co., 203 F.2d 299, 300 (6th Cir. 1953).

■ The defendant argues that the presumption should not operate because three prior art references, the ones relied on by defendant at trial, were not considered by the Patent Office:

(1) The prior manufacture and sale of the Taylor duct (hereinafter Taylor or Taylor duct);

(2) The prior publication of Electrical Equipment and Industrial Laboratories in May 1954; and

(3) The E. E. Franz Patent 2,712,916 (hereinafter Franz, or Franz Patent).

The application of this prior art to the Walch invention will be discussed infra. What must now be determined is whether the Patent Office considered prior art that was substantially the same as that cited by defendant. If such art was considered, the presumption of validity should stand. Solo Cup Co. v. Paper Machinery Corp., 240 F.Supp. 126, 133 (E.D.Wis.1965); United States Gypsum Co. v. Dale Industries, Inc., 260 F.Supp. 78, 83 (E.D.Mich.1966); Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828, 837 (6th Cir. 1956), cert. den. 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956), reh. den. 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245 (1956).

The Patent Office did consider prior art that was just as pertinent and very similar to that cited by defendants. Especially pertinent are V. I. Cruser, No. 2,082,099 (particularly figures 4 and 5) (PX 67, section 7); H. F. McLoughlin, et al., No. 2,324,791 (particularly figures 11 and 12) (PX 67, section 11); and A. Robertson, No. 2,397,291 (particularly figure 2) (PX 67, section 11). This prior art includes all the important features of that cited by defendant: round holes, restricted openings, and flexibility of side walls. An examination of the prior art considered by the Patent Office persuades the court to agree with the witness, Mr. Jeffers, that the prior art considered by the Patent Office was as good as or better than that proposed by defendant. Thus the presumption of validity remains.

Furthermore, that presumption is strengthened by the careful scrutiny given by the Patent Office in this case. Modern Products Supply Co. v. Drachenberg, 152 F.2d 203, 205 (6th Cir. 1945),

cert. den. 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030 (1946); Printing Plate, supra. Because of the interference proceeding, the scrutiny exhibited by the Patent Office was extra careful, as noted by the seven extensive searches made in connection with the Walch and Caveney applications.

As stated by the Sixth Circuit Court of Appeals in Cold Metal Process Co. v. Republic Steel Corp., supra:

> "The best of the art relied on here was before the Patent Office and this fact strengthens the presumption of validity. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203, 205, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030." Id. 233 F. 2d at 837.

█ There is a heavy burden of proof upon the party asserting invalidity. 35 U.S.C. § 282; Patterson-Ballagh Corp. v. Moss, 201 F.2d 403 (9th Cir. (1953); Ezee Stone Cutter Mfg. Co. v. Southwest Industrial Prod., Inc., 262 F. 2d 183 (8th Cir. 1958); Squeez-a-Purse Corp. v. Stiller, 175 F.Supp. 667 (N.D. Ohio 1959), aff'd 280 F.2d 424 (6th Cir. 1960), cert. den. 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Only by clear and convincing proof can the defendant overcome the presumption of validity. Moon v. Cabot Shops, Inc., 270 F.2d 539 (9th Cir. 1959), cert. den. 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960); Printing Plate, supra.

█ In determining validity it must be remembered that there is no natural or common law right to a monopoly of an invention. Applicants for patent monopolies under the Constitution must comply with the requirements of Title 35, United States Code, that Congress insists be met as a condition to exercising such monopoly. Holstensson v. V-M Corp., 325 F.2d 109, 125 (6th Cir. 1963).

█ The standard of patentability under Title 35 has been declared by the Sixth Circuit Court of Appeals to consist of three concepts: utility, novelty and invention. Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332

F.2d 406 (6th Cir. 1964), cert. den. 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964); Harvey v. Levine, 322 F.2d 481 (6th Cir. 1963); Maytag Co. v. Murray Corp. of America, 318 F.2d 79 (6th Cir. 1963); Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911 (6th Cir. 1960), cert. den. 368 U.S. 890, 82 S.Ct. 142, 7 L.Ed.2d 87 (1961); Allied Wheel Products v. Rude, 206 F.2d 752 (6th Cir. 1953); Printing Plate, supra.

The patent in suit may be said to be a combination patent, in that many of its elements have been used before, such as flexible fingers (as in Franz) and restricted openings (as in Taylor).

█ When all or many of the elements of a patent are old, one would expect that the standard of invention should differ from that required when new elements are disclosed. But the rule is well settled that:

> "It is established law that all the elements of a combination may be old, Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 442, 31 S.Ct. 444, 55 L.Ed. 527, and, if the elements coacting produce a new and useful result, the combination is patentable. Coats Loaders & Stackers, Inc. v. Henderson, 6 Cir., 233 F.2d 915, 921; Colgate-Palmolive Company v. Carter Products, Inc., 4 Cir., 230 F.2d 855, 862, opinion by Chief Judge Parker." National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224, 239 (6th Cir. 1959), cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960).

See also Monroe Auto Equipment Co., supra, and Firestone v. Aluminum Co. of America, 285 F.2d 928 (6th Cir. 1960), cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961).

█ The cases of Cold Metal Process Co. v. Republic Steel Corp., supra, and Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343 (2nd Cir. 1957), syllabae 2, 3 at page 347, cert. den. 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1958), are startling illustrations of the fact that combinations which appear

simple may, by reason of the impact which they have in their given fields, obtain patentability.

Each element of validity is hereinafter defined and applied to the patent in suit.

■ Utility, within the meaning of the patent statute, means that the object of the patent is capable of performing *some* beneficial function claimed for it. Smith v. Nichols, 21 Wall. (88 U.S.) 112, 22 L.Ed. 566 (1875); Seymour v. Osborne, 11 Wall. (78 U.S.) 516, 20 L.Ed. 33 (1871).

■ The invention need only accomplish one of the functions claimed for it to be useful. Besser v. Merrilat Culvert Core Co., 243 F. 611 (8th Cir. 1917).

■ A patent is prima facie evidence of utility. Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 F. 856 (4th Cir. 1901).

■ In addition, doubts relating to utility are resolved against an infringer. Western Electric Co. v. LaRue, 139 U.S. 601, 11 S.Ct. 670, 35 L.Ed. 294 (1891); Seymour v. Ford Motor Co., 44 F.2d 306, 308 (6th Cir. 1930).

With these legal considerations in mind, it is obvious that the Walch patent in suit has more than enough utility to pass muster. The elements of claim 5 are incorporated into the Panduit duct (PX 44), as are the listed objectives of the Walch invention. The testimony of Caveney and Luc indicated that the patented duct solved many problems in the control wiring field and was very useful.

■ Commercial success is also evidence of utility. Sandy MacGregor Co. v. Vaco Grip Co., 2 F.2d 655, 656 (6th Cir. 1924); Seymour v. Ford Motor Co., supra. The commercial success of the Panduit duct, covered by the Walch patent, is undisputed. President of plaintiff, Jack Caveney, testified that in the ten years after introduction the new duct sales increased from $15,000 to $400,000. Although defendant promised to show that such success was merely due to a booming industry, since other manufacturers outside the scope of the Walch patent also enjoyed great gains (defendant's Pretrial Brief, p. 26), no such evidence was produced at trial.

Considering all these facts, and the heavy burden which the law places on defendant in this instance, it is clear that claim 5 of the Walch patent possesses the requisite utility.

An application of the concepts of novelty and invention requires that they be discussed together to understand the nature of the law as it applies to the prior art and to the patent in suit.

■ Novelty is traditionally defined as a lack of "anticipation" by prior devices:

"Novelty does not exist if the patented device has been anticipated by a prior device, whether patented or not. *In order to have anticipation, it is necessary that all of the elements of the patented device, or their equivalents, be found in a single prior device where the elements do substantially the same work in substantially the same way*. Firestone v. Aluminum Co. of America, 285 F.2d 928, 930 (C.A.6); Allied Wheel Products v. Rude, 206 F.2d 752, 760 (C.A.6); 1 Walker, Patents § 47, at 255 (Deller ed.). In other words, a device lacks novelty if there is, or has been, a substantially identical prior device." Monroe Auto Equipment Co., supra, 332 F.2d at 414. (Emphasis supplied.)

■ In other words, a patented invention cannot be invalidated piecemeal under Section 102 by finding individual features separately in the prior art. Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1880); Morgan Const. Co. v. Wellman-Seaver-Morgan Co., 18 F.2d 395, 402 (6th Cir. 1927).

■ Prior art relied on as anticipation must in addition contain a suggestion of the way in which the result sought is accomplished by the second inventor. Munising Paper Co. v. American Sulphite Pulp Co., 228 F. 700, 703, 704 (6th Cir. 1915).

The determination of invention, or lack of it, is a vexing one, but essential to the question of validity. Judge Phillips, in the Monroe Auto Equipment case, supra, provides an excellent discussion of the difficulty in defining "that abstraction which we call invention." He goes on to consider relevant authorities and then states three considerations in reaching a decision on invention:

"First, a determination of what the prior art was: this involves factual questions. Secondly, there is a determination of what, if any, improvement the patentee has made over the prior art; this will usually turn on expert testimony and therefore is a question of fact. The final step is to determine whether the improvement would have been *obvious to one skilled in the art.*" 332 F.2d at 411.

See also Maytag Co. v. Murray Corp. of America, supra, 318 F.2d at 81; Firestone v. Aluminum Co. of America, supra; Aluminum Co. of America v. Sperry Products, Inc., supra, 285 F.2d at 917.

"From this it may be said that invention is synonymous with unobviousness. Thus to say that a device lacks invention and that it is obvious is to state the same legal proposition in two ways. Application of Jacoby, 309 F.2d 513, 516, n. 3, 50 CCPA 734." Monroe Auto Equipment, supra, at 410.

One may summarize these legal requirements to provide a step-by-step inquiry of novelty and invention:

(1) Determining what the prior art was;

(2) Defining the distinctions between the prior art and the patented invention;

    (a) If one piece of prior art uses all the elements of the patent claim, and in the same manner for the same results, the requirement of novelty is lacking;

(3) Deciding whether the improvements over the prior art, if any, would have been obvious to one skilled in the art at the time of the invention.

A determination of what the prior art was is a factual inquiry. That inquiry will be limited to the prior art relied on by defendant at the trial, the Franz and Taylor devices. (DX 49).

E. E. FRANZ PATENT NO. 2,712,916

FIG. 11

The Franz patent illustrated in Fig. 11 discloses a cable fanning strip consisting of a wall 5, having a plurality of spaced, hook-shaped projections emanating therefrom 6, which terminate two-thirds of the way down in a rectangular opening closely adjacent to another projection. The space 2, between the end of one projection and the back of the adjacent projection is smaller than the diameter of the wire placed in the opening, preventing accidental removal. The ends of the projections are flexible to provide insertion by deflecting the end and thereby widening the space between the end and the back of the adjacent projection; the remainder of the projection is to be rigid (Franz Patent, Col. 2, line 70, Col. 3, line 18).

Taylor Duct, as disclosed in the May, 1954 issues of Electrical Equipment (DX 9) and Industrial Laboratories (DX 10) (see also DX 11–13)

In addition to the exhibits in evidence on the Taylor duct, defendant requests the admission of newly discovered evidence: a Taylor duct installation in Pontiac, Michigan, made in 1954 and still in operation. Since the court has before it evidence on the nature and function of the Taylor duct, on how control panels in general are wired, and believes the testimony that Taylor sold such ducts in 1954, this new evidence is merely cumulative and would add nothing to the facts already before the court. For this reason defendant's motion to admit the newly acquired evidence is denied.

The Taylor duct discloses a U-shaped wiring channel with rows of holes in the side walls. The number of rows of holes depends on the depth of the channel and/or on the order of the customer; there may be one, two or three rows. The top row of holes has a slit from the top of the hole to the top of the sidewall.

At first the slit was wider than the diameter of wires to be inserted in the holes, but later the slit was narrowed, and insertion of wires could be accomplished by threading or by deflection of the sides, enlarging the opening of the slit. Once inserted, the wire could be trapped, and prevented from accidental displacement.

The holes in any rows beneath the top row are closed. The only way to place wires in those holes is to thread them.

There are substantial differences between these prior art devices and the device defined by the patent. That can first be seen by comparing the Franz and Taylor devices to the elements of claim 5.

—A side wall—(both devices have a side wall.)

—having longitudinally spaced substantially parallel slits—(as to both Franz and Taylor, it can be said that neither has "slits," their openings being as wide as they are high. Furthermore, the adjacent edges of the openings are not substantially parallel. Neither Franz nor Taylor has this element of the claim.)

—open at one edge of said wall—(this element is present in Franz and Taylor.)

—and defining substantially parallel edges on longitudinally spaced fingers—(neither Franz nor Taylor has substantially parallel edges, and it would be stretching the plain meaning of the words to say that the protrusions were fingers or that they were longitudinally spaced. In any event, this element of the claim is not present.)

—the free ends of said fingers being enlarged—(if the protrusions in Taylor could be called fingers, it could be said their ends are enlarged; the free ends of the Franz device are not enlarged. This element is remotely present in Taylor, but not in Franz.)

—to narrow the outer ends of the slits and provide restricted passages for the wires between the finger ends and thereby prevent accidental removal of the wires from between the fingers—(if the holes in Taylor were called slits (stretching the language), this element would be present in Taylor; however, this court expressly finds that "holes" are not "slits." The Franz device does not provide restricted passages *between* the finger ends, but between the end of one finger and the back of another. This element of the claim is thus not present in Taylor or Franz.)

—said fingers being flexible to permit their deflection and provide wider finger spacing at their free ends to facilitate positioning and removal of wires between said fingers—(broadly construed, this element can be said to be present in both Taylor and Franz.)

Thus, of the seven elements mentioned, less than half are present in either Taylor or Franz. The claim does not read on any single device in the prior art.

Neither Taylor nor Franz performs the functions or has the advantages listed by Walch and emphasized by the witnesses Caveney and Luc.

Although both prior art devices prevent accidental removal of the wires, easy insertion and removal are possible only when the wires are slack or disconnected. One of the main objectives of the Walch patent is to allow insertion and removal of connected wires which are relatively taut. This function is especially important in tracing or in preparing for revision while the panel is "hot" (still in operation) (Testimony of Caveney and Luc.). Demonstrations at the trial showed that fingers which were substantially parallel could perform this function much better than the circular sides of Taylor and Franz.

Another important objective of the Walch patent is provision of maximum useful space for leading wires out of the duct. The Walch patent teaches many more discreet openings per unit length than Taylor or Franz, because slits are

narrower than they are high, while the openings of Taylor and Franz are not. Furthermore, the design of Walch allows the wires to be placed at a substantially greater number of positions vertically through the side wall. Thus, both vertically and horizontally the Walch patent provides the advantages of maximum utilization of space not present in the prior art relied on by defendant.

Taking all these facts into consideration, it is clear that neither all the elements nor all the functions of the Walch invention are present in any combination of prior art, much less in any one example of prior art. This is said keeping in mind the prior art cited by the Patent Office, as well as that relied on by defendant. The Walch patent definitely possesses the requisite novelty.

All that remains for a determination of validity is finding whether the Walch invention would have been obvious to one skilled in the art.

As to the Franz device, there is little question that it would not have made the Walch invention obvious, even in combination with other prior art known at the time. In the first place, Franz was a fanning strip rather than a wiring duct.

Second, there is no evidence that the patent was anything more than "paper" prior art that had never been used. Although all prior patents are proper references, American Air Filter Co. v. Continental Air Filters, Inc., 347 F.2d 931 (6th Cir. 1965), the mere "paper" character of Franz lessens the weight, if any, which it should be accorded. Republic Iron & Steel Co. v. Youngstown Sheet & Tube Co., 272 F. 386 (6th Cir. 1921); Campbell v. Mueller, 159 F.2d 803, 809 (6th Cir. 1947).

Finally, Franz simply does not suggest two of the most important teachings in Walch: maximum usable area and ability to remove and insert taut wires without disconnection.

There was no testimony that Franz made Walch obvious. That is easy to understand, since even by hindsight Walch is not obvious from Franz.

The Taylor duct provides a more difficult problem. The defendant argued that any technician who wanted to expand usable area would have merely extended the holes of the Taylor duct downward, thus forming a duct identical to the Panduit duct which plaintiff agrees is covered by the Walch patent. The testimony of Taylor and Pollock, who designed the Taylor duct, supported this conclusion.

The actions of these two witnesses at the critical time belie their conclusions of obviousness stated in court, with Panduit and Walch before them. What seems obvious to them now was clearly not obvious to them at the time. When they wanted a greater area vertically, they punched closed holes in rows below the top holes (DX 9–10). Pollock testified that he tried the slit idea; but he rejected it out of hand, neither recognizing any of its great advantages nor noting its solution to the nagging problems in the electrical control panel field.

The advantages of the Walch invention were so unobvious to the people at Taylor that in time they reverted to the completely closed hole construction (PX 59, pp. 15–18, 20–23). Only when their customers demanded a duct similar to the Panduit duct did they return to a duct with any openings to the top of the side wall (Testimony of Taylor.) In short, the Walch invention was so unobvious that even when the Taylor people were on the brink of discovering it they had no idea of what they were on the brink of or what its advantages might be.

Defendant put great weight on its Exhibit 46—Exhibit C—showing a one-inch Taylor duct superimposed on a one-inch Panduit duct. Only one opening is shown on the exhibit, however, making it difficult to determine which duct provides easier access and removal through more flexible protrusions, and which provides more discreet openings per unit length. By viewing the die which made the Taylor duct (DX 22), it can be seen that the Taylor holes are spaced much

wider apart than the slits in Panduit. Furthermore, the openings in the Taylor duct are round, rather than straight. This feature means the access and removal in Taylor is more difficult, tending to trap the wires when the fingers are deflected.

This is not a difference in degree, but a difference in kind. The fact is that the Taylor people, and most others in the field, were "hung up" on round holes, failing to see the advantages of slits with substantially parallel sides.

This improvement, which seems simple and obvious by hindsight, was not obvious at the point in time just prior to when the patented device was made. As the court said in Monroe Auto Equipment, supra, at 412:

" * * * in considering the question of obviousness, we must view the prior art from the point in time just prior to when the patented device was made. *Many things may seem obvious after they have been made, and for this reason courts should guard against slipping into use of hindsight. We must be careful to 'view the prior art without reading into that art the teachings of appellant's invention.'* Application of Sporck, 301 F.2d 686, 689 [49 CCPA 1039]." (Emphasis supplied.)

Thus, the court concludes that the Walch device has novelty, utility, and invention. The presumption of validity remains and Walch Patent 3,034,301 is valid.[1]

### III. INFRINGEMENT.

The burden of proving patent infringement in this case is on the plaintiff. United States Rubber Co. v. General Tire & Rubber Co., 128 F.2d 104, 108 (6th Cir. 1942); Aluminum Co. of America v. Thompson Products, Inc., 122 F.2d 796 (6th Cir. 1941).

The patent claim measures the grant, McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800 (1891)[2]

---

1. Defendant has proposed introduction of a Stahlin duct called the "teardrop," and also of a letter from plaintiff's attorney stating that he considers that the teardrop would be an infringement. Defendant's avowed purpose in bringing in this duct, which was not in existence at the time this suit was instituted and is not in issue, is to show that since plaintiff thinks claim 5 covers the slightly curved sides of the "teardrop," he cannot distinguish the prior art on the basis that it has curved sides. None of the cases cited by defendant apply, because in all those cases an action had been instituted on the item analogous to the "teardrop." Such is not the case here. In fact, there is a dispute as to whether the "teardrop" is even manufactured. Plaintiff has not charged an infringement by the teardrop; his only opinion was in response to an inquiry by defendant's attorney.

There are means by which the defendant could have brought this evidence in. The procedure was discussed at the pretrial and the defendant agreed to proceed with the preferred manner of bringing the teardrop into the case:

"MR. PETHERBRIDGE (plaintiff's attorney): The Federal Rules provide exactly for this alternative. If you wish to raise something, raise it by counterclaim. We have alleged and set up a complete cause of action based on what we know.

THE COURT: Can you cover it in a responsive pleading?

MR. SIMPSON (defendant's attorney): We are not arguing, Your Honor, about the technicalities of how it should be raised. *We are willing to do whatever needs to be done to bring this in,* but we want to have it tried during the course of this trial if the plaintiff is going to continue to contend that it does in fact infringe.

THE COURT: Why don't you bring it in?

MR. SIMPSON: By counterclaim, amendment to the Answer—

THE COURT: On the proposition— counterclaim or whatever kind of pleadings are necessary. * * *" (Pretrial Tr. p. 21.) (Emphasis supplied.)

Considering defendant's agreement to bring the "teardrop" in in the proper way, his lack of case authority for it otherwise being admissible, and the general proposition that devices manufactured by defendant after the institution of the suit are not admissible, the "teardrop" evidence will not be admitted.

2. See also cases cited in an excellent article by Thomas Koykka, Infringement of Patents, 42 F.R.D. 43, 45–46 (1967).

and is the beginning point of infringement. As the United States Supreme Court declared in the case of Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950):

> "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

There is no dispute in this case that the words of the claim read literally on defendant's Loc-Slot duct. (See PX 30 and PX 30a.)

Loc-Slot

Web-Slot

But even when the words of the claim read precisely on defendant's product, that is not quite "the end of it." Infringement is not a mere matter of words. General Electric Co. v. Allis-Chalmers Co., 178 F. 273, 276 (3 Cir. 1910); Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); Linde Air Products Co. v. Morse Dry Dock & Repair Co., 246 F. 834, 838 (2d Cir. 1917).

■ "The question of infringement involves considerations of practical utility and substantial identity, and therefore must be quantitative as well as qualitative." Goodyear Shoe Mach. Co. v. Spaulding, 101 F. 990, 994 (C.C. 1900).

The defendant contends that both the Loc-Slot and Web-Slot ducts have solid fingers, while the Walch patent illustrates hollow fingers formed of wire.

■ A patent is not limited, however, to the particular embodiment of the invention shown and described in the specification, since the claims of the patent measure the invention. Holstensson v. Webcor, Inc., 150 F.Supp. 441 (N.D.Ill.1957).

The doctrine of equivalents has been used to extend the protection of the patent to an equivalent which "performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Products Co., supra at 608.

This language applies exactly to defendant's Loc-Slot and Web-Slot ducts. Both perform the same function disclosed by Walch: a wiring duct with a maxi-

mum number of discreet openings for use in control panels.

Both operate in substantially the same way as the Walch device, and obtain the same result. Wires are inserted and removed by deflecting the fingers, they are held in place by the resiliency of the fingers, and a maximum amount of vertical and horizontal space is provided for the exit of the wires.

Defendant argues that the Web-Slot duct is substantially different because none of the slits have openings to the top of the side wall. However, in the past defendant has instructed its customers to snip the web to insert wires (PX 11B). Once snipped, the Web-Slot operates in the same way as the Loc-Slot and the Walch patented device.

Defendant further claims that it has not been shown that any Web-Slot duct has ever been snipped. But a photograph of a web which has been snipped appears on the back page of the defendant's own literature (PX 11B.).

Thus, defendant's argument as to the Web-Slot duct is not meritorious. The plain facts are that the Web-Slot operates almost identically to the Loc-Slot, and both are equivalent to the Walch patent.

Finally, defendant argues that Walch never invented or seriously contemplated solid fingers, and his invention should not be extended that far. The facts do not support this view. The testimony of Walch, corroborated by his notes (PX 20) and the deposition testimony of General Electric patent attorney Freeman (PX 24, pp. 33–36), establish that Walch considered his invention to cover types of wiring grilles other than the wire form grille.

The Patent Office also considered this to be true, since claim 5, the count suggested by the Patent Office in the interference proceeding, is silent as to material of construction. The difference between solid fingers and those formed of wire was also minimized by the decision of the Court of Customs and Patent Appeals, supra.

All these considerations, together with the fact that fingers formed of wire operate substantially the same way and achieve the same results, persuade the court that the Walch patent in suit applies to solid fingers.

 In summary, the claim reads literally on the Loc-Slot and on the Web-Slot, when snipped. Both these ducts are also "equivalents" of the Walch invention. The plaintiff has met its burden of establishing that both the Loc-Slot and Web-Slot ducts manufactured by defendant directly infringe claim 5 of its valid patent No. 3,024,301.

An order may be entered granting plaintiff the injunctive relief prayed for, as well as an accounting.

Decision of the question of treble damages, costs, and attorney fees is withheld pending the accounting.

This opinion constitutes the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.