**PANDUIT CORPORATION, Plaintiff,**

v.

**STAHLIN BROS. FIBRE WORKS, INC.,**
**Defendant.**

Civ. A. No. G–293–71.

United States District Court,
W. D. Michigan, S. D.

Feb. 11, 1972.

Price & Heneveld, Grand Rapids, Mich., Randall G. Litton, and Lloyd Heneveld, Grand Rapids, Mich., of counsel, Petherbridge, O'Neill & Aubel, Chicago, Ill., Roy Petherbridge, Chicago, Ill., of counsel, for plaintiff

Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., Donald J. Simpson, Chicago, Ill., of counsel, Schmidt, Smith & Howlett, Grand Rapids, Mich., Richard L. Spindle, Grand Rapids, Mich., of counsel, for defendant.

## OPINION

FOX, Chief Judge.

The plaintiff, Panduit Corporation, brought this action asking the court to find the defendant in contempt of court for violation of the court's earlier injunction. The case involves a patent on electrical wiring duct owned by Panduit Corporation, U.S. Patent No. 3,024,301.

The duct is used in channeling, arranging and orienting electrical circuits, usually in large electrical "control panels."

The patent in question was issued on March 6, 1962 to Kurt R. Walch. The Panduit Corporation later bought the patent from the General Electric Company. After the issuance of U.S. Patent No. 3,024,301, defendant Stahlin Bros. manufactured and sold, among others, two electrical wiring ducts called the Lok-Slot duct and the Web-Slot duct. The plaintiff filed suit claiming that the defendant's Lok-Slot and Web-Slot ducts infringed plaintiff's patent.

After a lengthy trial this court found U.S. Patent No. 3,024,301 valid and infringed by both devices. [See D.C., 298 F.Supp. 435 (1969)]. The court's decision was appealed to the Sixth Circuit Court of Appeals and upheld as to both validity and infringement. [See 430 F. 2d 221 (1971)].

After the issuance of the court's injunction in May of 1969, defendant ceased the production and sale of the Lok-Slot and Web-Slot ducts. In their place the defendant now manufactures a "Tear-Drop" duct and a "Closed-Slot" duct. These two new ducts are the subject of the present contempt proceeding. The plaintiff contends that the new products are "infringing products" within the meaning of the court's injunction.

The standard applied in contempt proceedings following an adjudication of patent validity and infringement is abundantly clear. In such proceedings the question is whether the accused structure is equivalent to the original in relation to the patent in suit. Field Body Corporation v. Highland Body Mfg. Co., 13 F.2d 626 (6th Cir. 1926). Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., 71 F.2d 850 (6th Cir. 1934), certiorari denied Wadsworth Electric Mfg. Co. v. Sachs, 294 U.S. 724, 55 S.Ct. 552, 79 L. Ed. 1255. Thus, there are two focal points to the issue presently before the court: (1) the equivalency of the modi-

fied structures to the structures previously held infringing, and (2) the relationship of the new devices to the valid patent claim. Hirs v. Detroit Filter Corp., 424 F.2d 1040, 1041 (6th Cir. 1960).

Immediately before the hearing on the merits of plaintiff's allegations the defendant requested an in-chambers conference. The principal issue discussed was the proper role prior art should play in the upcoming proceedings. Plaintiff contended that prior art should play no role in contempt proceedings and that the sole issue before the court was the equivalency of the new devices to those already held infringing. Defendant, on the other hand, contended that the resolution of the issue required reference to the prior art to determine whether the new devices were more like prior art than the devices previously held infringing.

As early as 1926 the Sixth Circuit Court of Appeals resolved the question of prior art in contempt proceedings. In Field Body Corp. v. Highland Body Mfg. Co., supra, 13 F.2d at 627, the court said:

"We are not concerned with the prior art, nor with an original interpretation of the claims of the patent. It suffices here that in an action between the parties the patent was held infringed by appellant's original structure. The question, then, is whether the modified structure is the equivalent of the original in its relation to the patent in suit."

And again in 1934, in Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., supra, 71 F.2d at 852, the Sixth Circuit Court of Appeals said:

"We think it clear that the only issue presented by this appeal is whether the defendant's modified structures infringe the patent claims, and whether their manufacture violates the writ of injunction, and upon that issue neither the court below nor this court need consider the prior art."

The policy behind the Sixth Circuit decisions is clear. When an original suit is brought for patent infringement the parties are given the opportunity to test the validity of the patent claim, and if the claim is found valid to test whether the claim has been infringed by defendant's product. In an original patent proceeding the court examines the prior art in great detail. [See, for example, the court's opinion in the principal case, found at 298 F.Supp. 435 (1969)]. Such prior art is relevant to the validity and scope of the patent claim.[1]

Once the parties have had their day in court and a final determination is made on the merits, however, judicial policy calls for a definite end to a litigated question. The parties may, of course, appeal the court's decision, but if upheld, the parties are bound by the determination of the principle litigated.[2]

Advancement over prior art is critical to patent validity and a valid patent claim can only be read in terms of its advancement over prior art. Prior art is central to proceedings for patent infringement. This court conformed to the teachings of the Sixth Circuit Court of Appeals when at 298 F.Supp. 435 it exhaustively evaluated the status of prior art.

The Sixth Circuit Court of Appeals has said that in contempt proceedings the question is whether the modified structure is equivalent to the original in relation to the patent in suit. Supra. And, in resolving this question, the

---

1. The prior art was carefully considered first by the Patent Office when it decided the interference proceeding between Walch and Caveny. Prior art was again considered by this court and finally by the Court of Appeals on appeal.

2. See Vestal, Res Judicata by Judgment: The Law Applied In Federal Courts, 66 Mich.Law Rev. 1723 (1968).

court need not consider prior art. Wadsworth Electric Mfg. Co. v. Westinghouse Electric & Mfg. Co., supra. Field Body Corp. v. Highland Body Mfg. Co., supra. The relationship of the patent claim to the prior art has been completely considered.

 In testing the equivalency of the structures in relation to the patent in suit, the court must necessarily read the claim in the light of its original decision. It considers the modified structure in the light of the patent claim as determined earlier—including the court's examination of prior art. The court will not, however, reopen the question of how the claim should be read at a later contempt proceeding. Thus, the proper place to bring in evidence of prior art is in the original infringement proceeding.

## THE TEAR-DROP DUCT

The Walch patent, U.S. Patent No. 3,024,301, was designed to achieve the following functions or results:

A. easy insertion of wires in the duct;

B. prevention of accidental removal of wires from the duct;

C. provision of maximum useful space for bringing wires from the duct; and

D. facilitation of intentional removal of wires from the duct.

Additionally, Claim 5 of the Walch patent reads:

A wall for supporting and orienting wires comprising

A. a side wall

B. having longitudinally spaced substantially parallel slits

C. open at one edge of said wall

D. and defining substantially parallel edges on longitudinally spaced fingers

E. the free ends of said fingers being enlarged

F. to narrow the outer ends of the slits and provide restricted passages for the wires between the finger ends and thereby prevent accidental removal of the wires from between the fingers,

G. said fingers being flexible to permit their deflection and provide wider fingerspring at their free ends to facilitate positioning and removal of wires between said fingers.

As stated in the original opinion, "There is no dispute in this case that the words of the claim read literally on defendant's Lok-Slot duct." 298 F.Supp. 435, 448 (1969). See the original opinion, supra, for drawings of both the Lok-Slot and Panduit ducts.

Plaintiff herein asserts that Claim 5 likewise reads literally on the Tear-Drop duct and is the equivalent of the Walch patent. Obviously, the defendant contests this assertion. The evidence produced at trial focused on two points of contention concerning the Tear-Drop duct.

First, the defendant, both through its expert and its cross-examination of plaintiff's expert, sought to show that that part of Claim 5, which reads, "and defining substantially parallel edges on longitudinally spaced fingers," does not read on the Tear-Drop duct. There is no dispute that except for this language, Claim 5 does read on the Tear-Drop duct.

This court holds that the finger edges of the Tear-Drop duct are substantially parallel within the meaning of Claim 5 of the Walch Patent. The finger edges are not mathematically parallel. Claim 5, however, requires only substantial parallelism. Much testimony was heard on the nature of substantial parallelism; the defendant's argument being that although curved lines as shown in Figure 1 might be considered substantially par-

**1244**

allel, curved lines as depicted in Figure 2 surely are not.

**Figure 1 Figure 2**
[A4994]

The word substantial is derived from the word substance and means, "consisting of, relating to, sharing the nature of, or constituting substance: existing as or in substance." Webster's Third New International Dictionary (1963). In substance, the finger edges of the Tear-Drop duct are parallel. They are certainly parallel enough to define "longitudinally spaced substantially parallel slits." The edges clearly define "fingers," which achieve the functional results of the Walch patent, and therefore are substantially parallel.

In the words of Claim 5, the fingers of the Tear-Drop duct are narrow at "the outer ends of the slits and provide restricted passages for the wires between the finger ends and thereby prevent accidental removal of the wires from between the fingers," and "said fingers (are) flexible to permit their deflection and provide wider finger spacing at their free ends to facilitate positioning and removal of wires between said fingers."

The defendant's second argument is directed to the functional aspect of Claim 5 found in Part G quoted directly above. Defendant argues that the fingers of the Tear-Drop duct are not as flexible as those of either the Lok-Slot

duct or the Panduit duct, and, because of their shape, make the voluntary removal of wires more difficult.

It is incorrect to say the Tear-Drop duct is less flexible. Flexibility appears to depend far more on the size of the duct than anything else. The 3-inch Tear-Drop duct, for instance, is far more flexible than the 2-inch Tear-Drop duct. The 3-inch Tear-Drop duct, however, appears to be no more nor less flexible than the 3-inch Lok-Slot duct previously held infringing.

It is true that the Tear-Drop duct makes voluntary removal of wires somewhat more difficult when tautly wired. But even when wired tautly as in defendant's Exhibit CDX–1, the wire may be easily removed.[3] Furthermore, by defendant's own testimony less than 1% of all electrical wires are wired as tautly as in defendant's exhibit CDX–1.[4]

In its original opinion this court said:

But even when the words of the claim read precisely on defendant's product, that is not quite "the end of it." Infringement is not a mere matter of words. General Electric Co. v. Allis-Chalmers Co., 178 F. 273, 276 (3 Cir. 1910); Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S. Ct. 707, 42 L.Ed. 1136 (1898); Linde Air Products Co. v. Morse Dry Dock & Repair Co., 246 F. 834, 838 (2d Cir. 1917).

[24] "The question of infringement involves considerations of practical utility and substantial identity, and therefore must be quantitative as well as qualitative." Goodyear Shoe Mach. Co. v. Spaulding, 101 F. 990, 994 (C. C.1900).

\* \* \* \* \* \*

The doctrine of equivalents has been used to extend the protection of the patent to an equivalent which "performs substantially the same

---

3. During the trial the finger around which the wire was attached in defendant's exhibit CDX–1 broke. This fails to alter the court's ruling. The finger broke because of constant removal of the wire—both in

and out of court—by witnesses, parties, law clerks, and the court.

4. See the testimony of Mr. Paul Gloss at pp. 559–560 of the transcript.

function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Products Co., supra [339 U.S. 605] at 608, [70 S.Ct. 854, 94 L.Ed. 1097] 298 F. Supp. at 448.

Unquestionably the Tear-Drop duct is the equivalent of both the Lok-Slot duct and Claim 5 of the Walch patent. It accomplishes the same function or result through the use of substantially the same mechanism—the only possible point of contention being the curvature of finger edges. The Tear-Drop duct accomplishes all four of the functional advantages of the Walch patent set forth above. Supra, p. 1243. It does so by a device in all respects identical to the device described in Claim 5.

The court therefore holds that the Tear-Drop duct is the equivalent of both the Lok-Slot duct and the Walch device, and hence, is in violation of the court's injunction.

Counsel for both parties engaged in considerable argument over the obligation of plaintiff to specifically include the Tear-Drop duct in the original injunction. Defendant contends that because the plaintiff knew of the Tear-Drop duct and considered it infringing at the time of the original proceeding, it should have sought to specifically enjoin the device along with the Lok-Slot and Web-Slot ducts.

This argument is without merit. The Tear-Drop duct was not specifically enjoined in the original proceeding because there was no adjudication of its validity. And, there was no adjudication of validity because, rightly or wrongly, the court determined that the plaintiff could not bring it into the original proceeding because it was not being manufactured at the time the suit was instituted. The court therefore directed the defendant to bring in the Tear-Drop duct if it sought an adjudication concerning it. Defendant never brought the duct into the suit and it cannot now argue that *plaintiff* should have included it in the injunction.[5] If the defendant is arguing that the Tear-Drop duct was in fact being manufactured at the institution of the original suit this fact should have been brought to the court's attention then, not some two years later.

## THE CLOSED-SLOT DUCT

The starting point in discussing the Closed-Slot duct must be the court's findings of fact and conclusions of law in the original infringement proceedings. There the court stated:

"In summary, the claim reads literally on the Lok-Slot and on the Web-Slot, when snipped. Both these ducts are also 'equivalents' of the Walch invention. The plaintiff has met its burden of establishing that both the Lok-Slot and Web-Slot ducts manufactured by defendant *directly* infringe claim 5 of its valid patent No. 3,024,301." 298 F.Supp., at 449. (Emphasis supplied.)

Thus, the court found that the Web-Slot duct directly infringed the Walch patent.

The Closed-Slot duct replaced the Web-Slot duct and the standard to be applied in determining the validity of the Closed-Slot duct is, of course, the same as applied to the Tear-Drop duct. "The question, then, is whether the modified structure is the equivalent of the original in its relation to the patent in suit." Field Body Corp. v. Highland Body Mfg. Co., supra.

The court holds that the Closed-Slot duct is the equivalent of the Web-Slot duct. The Web-Slot duct is depicted at page 448 of the original opinion. The only difference in the Closed-Slot duct is the removal of the nubs on the insides of the longitudinally spaced fingers. Otherwise, the Web-Slot duct and the Closed-Slot duct are identical.[6]

---

5. See footnote 1 of original opinion, 298 F.Supp. 435, 447 (1969).

6. An examination of the record will reveal consistent and obvious confusion between the Closed-Slot and Web-Slot ducts on the part of attorneys and witnesses alike. See, for a startling example, the testimony of Martin Liberman, Tr. pp. 437–542.

The defendant's vice president and sales manager, Mr. Lyle Jackson, testified that it was the opinion of his company that the Web-Slot duct infringed only because of the nubs, and that the removal of the nubs brought it out of the scope of the court's injunction.

As the court's opinion reveals, the Web-Slot duct infringed the patent because it operated identically to the Lok-Slot and Panduit ducts, and not because it had nubs. Because of the nubs, however, the Web-Slot could be snipped either once or twice and operate exactly like the Panduit duct. Now that the nubs are removed the Closed-Slot duct operates identically with the Panduit duct only when snipped once. But with a single snip made with the shears carried by every electrician the Closed-Slot duct reads on Claim 5.

Thus, the Web-Slot infringed not because of the nubs but because "the plain facts are that the Web-Slot operates almost identically to the Lok-Slot, and both are equivalent to the Walch patent." 298 F.Supp. at 449. The Web-Slot infringed because, like the Lok-Slot, it performed substantially the same function in substantially the same way to obtain the same result as the Walch device.

When snipped once the Closed-Slot, exactly like the Lok-Slot and Web-Slot, performs substantially the same function in substantially the same way to obtain the same result. Like the Web-Slot, which also required snipping, the Closed-Slot duct achieves the results of:

A. easy insertion of wires in the duct;

B. prevention of accidental removal of wires from the duct;

C. provision of maximum useful space for bringing wires from the duct; and

D. facilitation of intentional removal of wires from the duct.

These are the functional advancements central to the validity of the Walch patent. And, because the Closed-Slot duct achieves these results it is equivalent not only to the Web-Slot duct, but the Walch patent itself.

The court listened to much testimony concerning the snipping of the Closed-Slot and Web-Slot ducts. From this testimony the court concludes that the Closed-Slot duct is snipped in actual use in the trade and in substantial amounts. The defendant marshalled a number of witnesses that established to the court's satisfaction that the Closed-Slot duct is also used unsnipped. This testimony, however, suffered from many weaknesses.

The defendant presented four witnesses who testified on this subject: Mr. MacDonald, a foreman with Polaroid Corporation; Mr. Martin Liberman, a channel duct wholesaler; Mr. Paul Gloss, a foreman with Protection Control, Incorporated; and Mr. Marvin A. Rozner, a channel duct salesman.

Mr. MacDonald's deposition established that Polaroid once used the Web-Slot duct and now uses the Closed-Slot duct unsnipped. Mr. Liberman testified that he sold about 50,000 feet of the Web-Slot duct over fifteen years—all of which was used unsnipped. But, as it turns out, of Mr. Liberman's twenty or so customers, the major one is Polaroid.

Mr. Gloss testified that his company used the Web-Slot and now the Closed-Slot duct unsnipped. Protection Control, Incorporated, unlike Polaroid, engages in the custom production in quantities of one, two, or three of a kind rather than mass production of a single version.

Finally, Marvin Rozner testified that he sold 350,000 to 400,000 feet of Web-Slot duct in the Chicago area alone. According to Rozner, none of this Web-Slot duct was snipped. This witness was clearly and convincingly discredited on cross-examination. In the first place only 480,000 feet of Web-Slot duct was sold in its entire eight-year production run. It is implausible that one salesman for a local electrical wholesale company sold 400,000 out of 480,000 feet of a nationally marketed product. Further-

more, when pressed on his knowledge concerning his customers' practice relating to snipping the ducts, it became apparent to the court that he simply paid no attention to it.

The defendant has established that there is some use of the Closed-Slot duct without snipping—exactly how much is unclear. The plaintiff, however, has clearly established that it is common trade practice to snip the duct.

In the original proceeding the defendant argued that the Web-Slot duct did not infringe because none of the slits had openings to the top of the side wall. The court held, however, that the defendant had "instructed its customers to snip the web to insert wires. Once snipped, the Web-Slot operates in the same way as the Lok-Slot and the Walch patented device." 298 F.Supp. at 449. All of the testimony offered here concerning the snipping of the Web-Slot duct is simply barred as res judicata. The Web-Slot has been adjudicated and the court will not reopen that question at this late date.

The court found that the Web-Slot duct *directly* infringed the Walch patent under 35 U.S.C. Section 271(a). The Closed-Slot duct is the clear equivalent of the Web-Slot duct. It performs the same function in the same way to achieve the same results. Like the Web-Slot duct, it is snipped, and once snipped operates in the same way as the Web-Slot and Walch patented device. The fact that it has some use unsnipped does not mean that the device fails to directly infringe the patent. Like the Web-Slot duct, it does. In simple terms it is the same device.

Throughout the contempt hearing the court offered the defendant the opportunity to make a separate record concerning "noninfringing use" of the Closed-Slot duct. The hearing was set for two days of trial time, but took three. At the close of the third day the court permitted a written proffer of proof and delayed any separate record. In view of the court's holding of direct infringement in the original proceeding concern-

ing the Web-Slot duct and its similar holding here concerning the Closed-Slot duct there is no need for a separate record on non-infringing use. Substantial non-infringing use is relevant only under 35 U.S.C. Section 271(c), which deals with contributory infringement. The defendant's devices directly infringe and the issue is therefore irrelevant.

Given the court's reading of the Sixth Circuit stance as to the introduction of prior art in contempt proceedings little could be gained from a separate record on this point. Defendant was not barred from proving structural and functional differences in its products. The only thing barred was the reintroduction of prior art already considered at the principal trial.

Decision on the question of treble damages, costs, and attorney fees is withheld pending the accounting.